Filed 1/11/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH VERDUCCI,<br><br>     Defendant and Appellant. | A140040<br><br>(Solano County<br>Super. Ct. No. VCR195548) |

On the evening of January 14, 2007, Jose Corona was shot to death during an attempt to kill a cast-out gang member. After three mistrials in which juries deadlocked, appellant Joseph Verducci was convicted of first degree murder of Corona (Pen. Code, § 187, subd. (a)).[1] Verducci was sentenced to an indeterminate prison term of 50 years to life. On appeal, Verducci contends the trial court abused its discretion and deprived him of due process by denying his motions to dismiss and admitting hearsay evidence. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Verducci was charged by information with murder (§ 187, subd. (a)) and criminal street gang and firearm enhancements (§ 186.22, subd. (b)(1), former § 12022.53). The first jury trial began in November 2009, and the following December the court declared a mistrial when the jury deadlocked eight to four in favor of a guilty verdict. A second trial in March 2011 ended after that jury reported it was hung 11 to

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

[1] Undesignated statutory references are to the Penal Code.

one in favor of a guilty verdict.  Both sides made additional arguments to the jury.  After deliberating further, the jury repeated it could not reach a verdict and the court declared a mistrial.

A third trial began in April 2012, and the jury reported on May 1 that it was hung, "nine not guilty and three guilty."  The court asked the jury to continue deliberating.  On May 3, the jury again stated it could not reach a unanimous verdict.  The court once again declared a mistrial.  A fourth trial began in April 2013.

*The Prosecution's Evidence at the Fourth Trial*

<u>Thomas Covey's Testimony</u>

Thomas Covey testified that he and Coby Phillips were among the cofounders and leaders of a white supremacist gang, the Family Affiliated Irish Mafia (FAIM).  Verducci joined FAIM in 2001 or 2002.  FAIM's primary purpose was to make money from selling drugs, primarily methamphetamine, in the area between the counties of Alameda and Napa.  As time went on, FAIM began moving larger amounts of methamphetamine.  At its peak, FAIM dealt 10 to 15 pounds per week.  The source for FAIM's methamphetamine was two Mexican nationals with connections to the Mexican Sinaloa cartel—Jose Vega-Robles (known as Carlos) and Sergio Vega-Robles.[2]  In order to collect money owed from drug sales, FAIM members routinely inflicted violence, including beatings, stabbings, shootings, and murder.[3]

In 2006 and early 2007, most of the FAIM leadership responsibilities fell to Thomas because Coby was in federal custody.  In 2006, Coby and Thomas suffered a falling out.  While Coby was in prison, his wife, Stacey Phillips, began an affair with Thomas's brother, Tim Covey.  Soon thereafter, Coby learned of the affair and ordered Thomas to kill Tim.  Thomas promised to shoot Tim, but ultimately took no action.

---

[2] Given the numerous family relationships and mutual surnames involved, we hereafter refer to certain persons by first name.

[3] For example, Thomas testified on cross-examination that he and Coby were involved in a drive-by shooting in 1999 or 2000.  Thomas was in the car when Coby shot at two men with whom they had "issues."

Further tension was created by Thomas's physically abusive relationship with Stacey's sister, Tina Cates.[4]

Toward the latter part of 2006, Coby and Thomas began threatening to kill one another and their respective families. On at least one occasion, Thomas pulled a gun on Coby. In November 2006, Thomas took a stolen .45 caliber handgun and drove to Coby's house, intending to kill him. On the way, he led police on a high speed chase and was arrested. Thomas remained in custody until he posted bail in January 2007.[5]

On January 14, 2007, Thomas and fellow FAIM member Kyle Galal spent the day watching football and drinking heavily. That evening they went to the My Office bar, which was around the corner from Coby and Stacey's house in Vallejo. Thomas stepped outside to smoke a cigarette and saw Stacey's black Impala pull into the bar's parking lot and then speed off. He could not see who was in the car because the windows were tinted and rolled up. Thomas called Stacey on his cell phone, asked who was in her car, and apologized for the conflict between him and Coby. He was emotional, but Stacey did not accept his apologies. Instead, she asked if Thomas wanted her to send Verducci to the bar. She said Verducci was high on drugs and acting "crazy." Thomas assumed Stacey had learned where he was from the people in the Impala or had been in the Impala herself. Not overly concerned, Thomas went back into the bar. Not long thereafter, Thomas and Galal again left the bar and walked around the corner of the building to urinate. Thomas noticed a maroon Ford Taurus, which he recognized as belonging to Carlos, pulling into the parking lot. Thomas was immediately concerned and began moving towards the bar's front door, as Carlos was a good friend of Coby's.

---

[4] Around this same time, a large debt was owed to the Sinaloa cartel for drugs. According to Thomas, only Coby owed the debt and no one looked to Thomas to pay it. However, Thomas also admitted committing a string of crimes during the latter part of 2006 to raise money to purchase "more drugs." Among other things, he stole a car and broke into his father's home to steal guns. Thomas kept a .45 caliber revolver from his father's collection and sold the rest of the stolen guns.

[5] When confronted by his father regarding possession of the stolen gun, Thomas denied any responsibility for the burglary.

Thomas saw Verducci and Carlos get out of the car. Thomas initially focused on Carlos, who Thomas knew to be a very violent person. Thomas saw that Carlos had a knife, but never saw Carlos with a gun. Thomas then glanced in Verducci's direction and saw Verducci point a gun at him and begin firing. Thomas ran towards the bar's front door and then inside, ducking and weaving as he ran. Jose Corona, who had been sitting on a bar stool near the front window of the bar, was shot in the head. The bullet entered Corona's left temple and brain, killing him.

When police arrived, Thomas was arrested on an outstanding warrant. After his arrest, Thomas refused to speak to police. He posted bail and remained out of custody until May 2007. When Thomas returned to custody in May 2007, several other FAIM members were incarcerated in the same unit. Thomas tried to regain his good standing in FAIM. Thomas was subpoenaed to testify at Verducci's preliminary hearing in July 2008, but he refused because he was "still living by the code that we don't tell on each other."[6] Thomas was subpoenaed a second time to testify at Verducci's first trial. He again refused. Thomas decided to cooperate in 2009 after FAIM members tried to kill him in prison. In exchange for a favorable plea deal in another case, Thomas agreed to testify against Verducci. Thomas, his wife, and his son were placed in a witness protection program.

Even before reaching the favorable plea agreement, however, Thomas had implicated Verducci in the shooting. In March 2007, Thomas's father called Thomas and accused Thomas of a second burglary at his home. Thomas was unaware the police were recording the call. Thomas denied involvement in the burglary.[7] However, when the

---

[6] After pleading "the Fifth" at the preliminary hearing, Thomas was placed in the holding cell area. Verducci, who was also in a holding cell, yelled, "No names, no papers. And you'd better keep your fucking mouth shut."

[7] None of the audio recordings are part of the record on appeal, as Verducci did not designate the exhibits. (See Cal. Rules of Court, rule 8.224.) However, Verducci did augment the record to include the transcripts of these exhibits. Because the audio recording contents apparently are not in dispute, we rely on the transcripts instead of the audio recordings actually admitted at trial.

conversation turned to the My Office bar shooting, Thomas said, "They tried to take my fuckin head dad. . . . [¶] . . . [¶] Joe Verducci, that's the one who did it. Punk ass Joe did it for Coby."

### Steve Buchanan's Testimony

Steve Buchanan joined FAIM in 2000, after meeting Thomas in state prison. Buchanan thought FAIM gang members were "[his] caliber of people" because the gang had a violent reputation that matched his own. In 2005 or 2006, Buchanan met Coby and Verducci, who was called "Joe Rue." Buchanan thought Verducci and Coby were related, as Verducci called Coby "cousin." Verducci frequently stayed at Coby's house, sleeping on a blanket and pillow on the floor next to Coby's bed. Buchanan had seen Verducci with a nine-millimeter automatic handgun.[8]

Buchanan became aware of a problem between Coby and Thomas when, on one occasion in late 2006, Coby called Thomas and put him on the speakerphone. Buchanan heard Coby tell Thomas to get his FAIM tattoos removed. Coby also threatened to kill Thomas. Buchanan explained that telling a gang member to remove his gang tattoos is a "green light," which meant there would be no repercussions from the gang if that person was injured. Buchanan himself was "green lighted" by FAIM in 2008, after he agreed to testify against FAIM members in another murder case. He received a $1,000 stipend every month thereafter.

### Clayton Cates's Testimony

Between 2004 and 2008, Stacey's brother, Clayton Cates, lived with Stacey and Coby. Clayton helped FAIM traffic drugs by transporting methamphetamine between Los Angeles and the Bay Area.[9] Clayton knew Verducci as Coby's close associate.

---

[8] It was not unusual for FAIM members to carry guns.

[9] On cross-examination, Clayton testified that he knew the drugs were sourced from the Sinaloa cartel in Mexico. He was aware that, at some point, FAIM owed a debt to the cartel.

On the evening of January 14, 2007, Clayton was at Joanna Nuñez's house with Carlos, Verducci, and Melesa Wright. Verducci told Clayton that Stacey had just called him and said Thomas was threatening her family. Verducci asked Clayton to give him a ride to "the bar." Thereafter, Clayton drove Verducci, Wright, and Carlos to the My Office bar in Carlos's Ford Taurus. Verducci was seated in the front passenger seat with his backpack. Clayton did not see a gun, but he knew Verducci always carried a gun in this backpack. Clayton knew of a plan to shoot Thomas, but said he "didn't think [Verducci] would do it." Clayton recalled Verducci using his cell phone while in the car. Clayton said Verducci's cell phone number at the time was (707) 712-1152.

After arriving at the My Office bar, Clayton saw Verducci touch his backpack and then exit the car, followed by Carlos. Clayton and Wright stayed behind in the car. Next, Clayton heard six or seven gunshots. When the shots ended, Verducci and Carlos ran back to the car and got in. Verducci said, "[I] got him." Clayton drove away and learned later that night Thomas had not been killed.

At the time, Clayton did not report the events to police. In November 2008, Clayton was arrested on drug charges and questioned about the shooting. Initially, Clayton did not tell the truth, but he eventually admitted being in a car when someone got out and shot at Thomas. Clayton pled no contest to manslaughter and agreed to testify in exchange for probation with an 11-year suspended sentence. Clayton was also placed in a witness protection program and thereafter received $1,200 each month for rent. Clayton understood the checks would stop coming and he would go to jail if he refused to testify.

Police Investigation

Police arrived at the bar around 8:00 p.m. Bullet strike marks were located on a front window, on the exterior wall near the door, and on the wooden door frame. The glass in the front window was shattered. Officers found Corona lying face up on the ground, close to that window, with a gunshot wound to his head. A bullet was recovered from Corona's body. Another bullet fragment was recovered from a pool table. Police also found five bullet casings in the parking lot outside the bar.

6

### Firearms Evidence

Five days before the My Office bar shooting, on January 9, 2007, Verducci had used a gun to shoot Casey Holmes in the leg. A firearms expert examined the bullet casings collected from the parking lot outside the My Office bar and compared them to the bullet casing recovered on January 9, 2007. The expert determined all the casings were of the same caliber and fired from the same gun.

### Michael Whisenhunt's Testimony

Although he claimed not to recall the call itself, Michael Whisenhunt testified that two male voices on a January 13, 2007 recorded jail phone call were his and Coby's. In the recording, which was played for the jury over Verducci's hearsay objection, Coby calls Whisenhunt's landline from jail. Coby reports to Whisenhunt that "Bubba" is out of jail and conveys that they are not on good terms.[10] Coby then asks Whisenhunt, "Can you call (Joanna) on your cell phone and see if she has a number for ['Joe Rue']?" While still on the phone with Coby, Whisenhunt makes a call to "Joanna" and then indicates he is dialing 712-1152 on his cell phone. Whisenhunt says, "(Tina)'s on the phone" and that "she's with (Joe)." Coby says, and Whisenhunt repeats, "[P]ut [Joe Rue] on the phone." Whisenhunt then acts as go-between in a conversation between Coby and "Joe Rue." During that conversation, Coby expresses, and Whisenhunt conveys to "Joe Rue," Coby's desire that "Joe" stay at Coby's house to protect his children now that Thomas is "out." However, Whisenhunt testified that he had never met Verducci and could not identify his voice.

### Phone Records

Phone records from Metro PCS showed calls from Thomas's phone at 7:22, 7:31, 7:40, and 7:58 p.m. on January 14, 2007. Metro PCS records also show the phone number (707) 712-1152 received a call at 7:55 p.m. When it received that phone call, the (707) 712-1152 cell phone used the same cell tower Thomas's phone had used between 7:22 and 7:58 p.m.

---

[10] "Bubba" was a nickname used by Thomas.

7

Gang Expert Testimony

The prosecution's gang expert believed Verducci was a member of FAIM. The expert opined the attempt to kill Thomas benefited the gang because it was an attempt to get rid of a gang member who posed a threat to the gang's leader.

*Defense Evidence*

Stacey's Prior Testimony

At the fourth trial, Stacey was called by Verducci but refused to testify after her immunity agreement was withdrawn by the People. She was found unavailable to testify, and portions of her testimony at prior trials were read into the record. In January 2007, Stacey's marriage to Coby was strained because they were both having affairs—Coby with Joanna Nuñez and Stacey with Tim. In the early morning hours of January 1, 2007, Coby and Stacey had an argument. Coby threw Stacey to the ground in their master bathroom and began punching her in the face. He bloodied her face and blackened her eyes. Stacey's brother, Michael, had been spending the holidays with Stacey and Coby. Michael tried to leave with Stacey, but Coby rammed Michael's car with Stacey's car. Police arrived and arrested Coby.

At the 2012 trial, Stacey testified that after his arrest, Coby left a cell phone with the number (707) 712-1152 at the house for Verducci. However, when she testified in 2009, Stacey had denied giving Verducci that phone. Stacey's testimony at prior trials also conflicted as to whether she called Verducci on the night of January 14, 2007. In 2009, she denied calling Verducci. However, Stacey acknowledged that, after making a deal with prosecutors, she testified in 2011 to having in fact talked to Verducci that night. Stacey also admitted lying throughout her testimony at Coby's trial for domestic violence, wherein he was acquitted. She also admitted lying in her past testimony in this case. Stacey recalled a debt owed to Carlos. According to Stacey, Coby owed a large sum because Thomas and his brother Tim had not paid their share for drugs they had obtained.

8

<u>Jamie Beckwith's Testimony</u>

Jamie Beckwith, who was Carlos's former girlfriend, testified Carlos sold large quantities of drugs for a living and usually carried a firearm. In the latter part of 2006, Beckwith and Carlos were living with Nuñez in Vallejo. Coby and Stacey also lived in Vallejo. Beckwith and Carlos were frequent visitors in their home.

Beckwith remembered Coby's arrest at the end of 2006. After his arrest, Beckwith recalled an evening in January 2007 when she and Carlos went to Stacey's home for dinner. They drove over in Carlos's maroon Ford Taurus. Stacey, Tina, Clayton, and Timothy were also at Stacey's house. At one point, the women were in the kitchen and the men were in the living room. Beckwith overheard one of the men say "Tommy [was] snitching" and "a rat." All the men then left. She also heard the phrase "at the bar." Beckwith did not know where they went, but she saw a news bulletin about a shooting that same night. The bulletin included footage of the My Office bar.[11] Beckwith was concerned that Carlos might have been involved in the shooting.

Beckwith testified she had met Verducci once. At the third trial, she testified she did not know Verducci at all. Beckwith claimed she had not recognized him until after she got on the witness stand and simply failed to correct her mistaken assertion. Verducci was not present at Stacey's home when the men discussed Tommy being a snitch.

*Closing Argument*

The shooter's identity was the focus of closing arguments. The prosecutor argued that Clayton's and Thomas's testimony identifying Verducci as the shooter was corroborated by the firearms evidence, phone records, and motive evidence. Verducci's trial counsel, on the other hand, argued that the prosecution's witnesses should not be believed, given their criminal pasts and incentives they had to testify against Verducci.

---

[11] A police officer—who was present at the scene between 8:00 p.m. and 12:30 a.m. the next morning—testified that he did not observe any news cameras.

The defense also relied on Beckwith's testimony, as well as the debt evidence, to suggest Carlos was the shooter.

*Verdict and Sentence*

The jury found Verducci guilty of first degree murder and found the enhancement allegations true. The trial court denied Verducci's motion to dismiss and sentenced Verducci to a term of 25 years to life on the murder count, plus a consecutive term of 25 years to life for the firearm enhancement—for a total of 50 years to life. The court ordered the sentence to be served concurrently with a term Verducci was already serving for a separate 2007 conviction. Verducci filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Verducci contends the trial court abused its discretion and deprived him of due process by denying his motions to dismiss and admitting hearsay evidence contained in the January 13, 2007 phone call. Neither argument has merit.

A. *Denial of the Motions to Dismiss*

First, Verducci maintains that the trial court abused its discretion when it failed to grant his motions to dismiss after his three previous trials ended in hung juries. Verducci contends that his due process rights were violated by the fundamental unfairness of a fourth trial relying on virtually the same evidence. According to Verducci, "[t]he sequence of trials shows that [his] conviction was the outcome of a process of attrition whereby the prosecution learned the defense strategy and fine-tuned its case until it finally obtained a conviction."

Verducci concedes that double jeopardy principles do not mandate a dismissal and bar of retrial when juries deadlock. "It is well established that the Fifth Amendment's double jeopardy clause bars reprosecution *following a defendant's acquittal*." (*People v. Batts* (2003) 30 Cal.4th 660, 679, italics added.) And some prosecutorial misconduct resulting in mistrial "not only constitutes a due process violation but also a double jeopardy violation, and hence warrants not only reversal but dismissal and a bar to reprosecution." (*Id.* at p. 692.) However, double jeopardy principles do not bar retrial when a mistrial is justified by " 'manifest necessity' "—for example, when jurors are

10

unable to agree on a verdict. (*Id.* at p. 679.) Verducci instead relies on section 1385, subdivision (a), which provides in relevant part: "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

" 'Dismissals under section 1385 may be proper before, during and after trial.' [Citation.] Because the concept of 'furtherance of justice' (§ 1385) is amorphous, we enunciated some general principles to guide trial courts when deciding whether to dismiss under section 1385. Courts must consider 'the constitutional rights of the defendant, and the interests of society represented by the People,' and '[a]t the very least, the reason for dismissal must be "that which would motivate a reasonable judge." ' " (*People v. Hatch* (2000) 22 Cal.4th 260, 268.)

"A determination whether to dismiss in the interests of justice after a verdict involves a balancing of many factors, including the weighing of the evidence indicative of guilt or innocence, the nature of the crime involved, the fact that the defendant has or has not been incarcerated in prison awaiting trial and the length of such incarceration, the possible harassment and burdens imposed upon the defendant by a retrial, and the likelihood, if any, that additional evidence will be presented upon a retrial. When the balance falls clearly in favor of the defendant, a trial court not only may but should exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice." (*People v. Superior Court* (*Howard*) (1968) 69 Cal.2d 491, 505; accord, *People v. Carmony* (2004) 33 Cal.4th 367, 375.) We review a trial court's refusal to dismiss for abuse of discretion. (*Carmony,* at p. 374.)

1. *Background*

Verducci invited the trial court to dismiss the case on two relevant occasions—in advance of the fourth trial and after the jury's verdict. In both instances, the defense filed a motion to dismiss the case in the interests of justice. Verducci cited the three prior hung juries and argued a fourth trial would be vindictive and violate due process.

In denying Verducci's pretrial invitation to dismiss, the court explained: "It is pretty unusual . . . to have a fourth trial after three hung juries. And there was quite a

wide swing in the votes, if you will. . . . [¶] The first trial was 8 to 4 for guilt. The second trial was 11 to 1 for guilt. The third trial was 9 to 3 for acquittal. . . . [¶] And the difference between the first trial and the second trial was [Thomas] testified in the second trial, not the first. . . . [¶] The holdout juror in the second trial, as I recall, had some issues. I think at one point I had to inquire of all the jurors as to whether or not that juror was deliberating. And it was a discretionary call on my part to find that he was and not remove him. [¶] And then the difference between the second trial and the third trial was, in terms of evidence . . . was Jamie Beckwith. [¶] . . . [¶] What I do know is that . . . apparently Ms. Beckwith has . . . made statements now that . . . contradict portions of her trial testimony. [¶] Apparently, [Wright], who has not yet testified in any of these trials and is purported to be . . . the right front passenger in the car that allegedly brought Mr. Verducci and Mr. Robles to the bar. She is now in custody, apparently. I signed a removal order to bring her to trial. . . . Whether she'll actually testify or not, I don't know.

"And Mr. Verducci has been in custody this entire time. But, as I understand it, he's serving a sentence. Even if this case were dismissed, he'd still be in custody. . . . [¶] These are serious charges. The evidentiary landscape has changed. There is some likelihood of additional evidence being offered. There really is no dispute that the gun used . . . was the same gun that Mr. Verducci had in his possession to commit the [Casey Holmes] offense some days before. It wasn't a matter of months or years. They were closely connected in time. [¶] I just think considering all the evidence, society's interest, I don't view this as harassment or vindictiveness on the part of the People. It's just a difficult case."

The trial court also denied Verducci's postverdict motion to dismiss. It acknowledged an absence of binding authority to support Verducci's argument, but explained: "There are a couple of cases from other states . . . . [¶] . . . [¶] I thought, for the sake of clarity of this record, that the factors that those states' Courts set out to govern the Court's discretion might be [instructive] here. [¶] One of the factors is the severity of the offense charged. Well, this is quite a severe charge. First degree murder, the

discharge of a firearm, and a gang enhancement. [¶] A number of prior mistrials and the circumstances of the jury deliberations in those trials, . . . the first jury . . . was hung 8 to 4 for guilt. The second, 11 to 1 for guilt. . . . [¶] And then kind of in the turnaround, the third trial ended with a hung jury that was reported to me . . . to be 9 to 3 for acquittal. [¶] In that third trial, [Beckwith] had been called . . . by the defense . . . . [¶] . . . [¶] And then [Buchanan] . . . did not testify in that trial. [¶] . . . [¶] So there was kind of a different flavor or mix of witnesses the last trial round. [¶] [Stacey], the People basically withdrew their offer of immunity, under which she had testified previously. . . . [¶] [T]he primary reason I allowed a fourth trial in the first place was because . . . there was this different information regarding [Beckwith]; [Wright] had been located and was expected to testify; and . . . I thought that was the right decision, and still do think that. [¶] . . . I think this is a relatively strong case, particularly given the fact that the firearm used to commit this crime is the same firearm [Verducci] used just a few days earlier in Pinole to commit a crime that he stands convicted of and for which he's still serving a sentence. [¶] . . . I have no reason . . . to question [the prosecutor's] professional competence or how she acted in the trial."

The court continued: "[Verducci] has been incarcerated for a long time, but all of that time . . . he's been serving a sentence out of Contra Costa County, that's eleven plus years in length. [¶] . . . He would have been in custody regardless of whether this case went to trial once, twice, three times, or four. [¶] And in terms of harassment, given the severity of the charges, the difficult circumstances under which the People found themselves with witnesses refusing to testify, this just doesn't strike me as a case where the Court should grant a motion to dismiss because the defendant feels like he's been harassed. [¶] . . . And basically, the evidence was strong enough I think it warranted a fourth trial. [¶] And I just have in mind the type of case this was, the circumstances under which it was committed. And I think in terms of the protection to society in case the defendant should actually be guilty . . . I just think all of that weighs against granting the motion to dismiss."

13

2.    *Analysis*

Our courts of appeal have not addressed whether successive trials after jury deadlock that do not violate double jeopardy principles may still violate a defendant's due process rights.[12]  For this reason, Verducci relies on authority from other jurisdictions concluding that "precepts of fundamental fairness, together with the judiciary's need to create appropriate and just remedies, and its general responsibility to assure the overall efficient administration of the criminal justice system, confirm an inherent power in a trial court to dismiss an indictment with prejudice following general mistrials attributable to repeated jury deadlocks."  (*State v. Abbati* (N.J. 1985) 493 A.2d 513, 517 (*Abbati*); accord, *State v. Sauve* (Vt. 1995) 666 A.2d 1164, 1168; *State v. Moriwake* (Hawaii 1982) 647 P.2d 705, 712; *State v. Witt* (Tenn. 1978) 572 S.W.2d 913, 917.)

The *Abatti* court held that "a trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict *when it determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely*." (*Abatti, supra,* 493 A.2d at p. 521, italics added.)  It also announced a set factors to govern a trial court's decision whether to dismiss the indictment:  "(1) the number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney.  The court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges and the public's concern in the effective and definitive conclusion of criminal

---

[12] One published opinion of a superior court appellate division holds California trial courts have discretion to dismiss, under section 1385, when a prior trial has resulted in a hung jury.  (*People v. Steinbrook* (1978) 85 Cal.App.3d Supp. 8, 9.)  However, the opinion is exceedingly spare in its analysis.  (*Ibid.*)

14

prosecutions. Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness."[13]  (*Id.* at pp. 521–522.)

The People urge us not to follow Verducci's nonbinding authority, asserting a double jeopardy violation provides the sole basis for the remedy Verducci seeks.  We agree with the People that a dismissal "in furtherance of justice" would not necessarily afford Verducci a bar to further prosecution.  (See § 1387, subd. (a) [except in circumstances not relevant here, "[a]n order terminating an action pursuant to this chapter . . . is a bar to any other prosecution for the same offense if it is a felony . . . *and the action has been previously terminated pursuant to this chapter*" (italics added)]; *People v. Hatch, supra,* 22 Cal.4th at p. 270 [§ 1387 "establishes that *two dismissals* pursuant to section 1385 . . . bar retrial on felony charges except in limited circumstances" (italics added)].)  And our Supreme Court has cautioned that "[t]he remedy mandated by the double jeopardy clause—an order barring retrial and leading to the dismissal of the criminal charges against the defendant without trial—is an unusual and extraordinary measure that properly should be invoked only with great caution."  (*People v. Batts, supra,* 30 Cal.4th at p. 666.)

Yet unlike the People, we do not read *Richardson v. United States* (1984) 468 U.S. 317 as necessarily foreclosing that remedy.  (*Id.* at pp. 322–323.)  The *Richardson* defendant was charged with two counts of distributing a controlled substance and one count of conspiring to distribute a controlled substance.  The jury acquitted him of one count but was unable to reach a verdict on the other two.  A mistrial was declared as to those counts, and they were set for retrial.  (*Id.* at pp. 318–319.)  The defendant unsuccessfully moved for a judgment of acquittal based, in relevant part, on the double jeopardy clause of the Fifth Amendment.  (*Id.* at p. 319.)

---

[13] We observe that these factors are not substantively different from the balancing section 1385 requires.  (Compare *Abatti, supra,* 493 A.2d at pp. 521–522 with *People v. Superior Court* (*Howard*)*, supra,* 69 Cal.2d at p. 505.)

15

The United States Supreme Court rejected the argument. It explained: "It has been established for 160 years . . . that a failure of the jury to agree on a verdict was an instance of 'manifest necessity' which permitted a trial judge to terminate the first trial and retry the defendant, because 'the ends of public justice would otherwise be defeated.' [Citation.] Since that time . . . we have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." (*Richardson v. United States, supra,* 468 U.S. at pp. 323–324.) "[A] trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." (*Id.* at p. 326.).

Verducci's circumstances are distinguishable from those presented in *Richardson v. United States, supra,* 468 U.S. 317. Unlike the *Richardson* defendant, Verducci relies on the due process clause of the Fourteenth Amendment, under which "criminal prosecutions must comport with prevailing notions of fundamental fairness." (*California v. Trombetta* (1984) 467 U.S. 479, 485.) Furthermore, Verducci had been tried not once before, but on three prior occasions.

We will assume without deciding that the trial court had discretion to dismiss the action against Verducci. Nonetheless, the authority Verducci cites is distinguishable because those reviewing courts did not reverse a trial court's order declining to dismiss. (*People v. Steinbrook, supra,* 85 Cal.App.3d Supp. at p. 9; *Abbati, supra,* 493 A.2d at p. 516; *State v. Moriwake, supra,* 647 P.2d at p. 708; *State v. Witt, supra*, 572 S.W.2d at pp. 914, 917.) Under *Abatti,* "[a]n appellate court reviewing the decision of a trial court to dismiss an indictment with prejudice must ensure that the correct standard was employed by the trial court. [Citation.] Presupposing that that threshold is met, the trial court's decision is entitled to deference for the obvious reasons that the trial court saw the

16

witnesses and heard the testimony.  The decision should be reversed on appeal only when it clearly appears that the exercise of discretion was mistaken." (*Abatti,* at p. 522.)

Here, the trial court implicitly recognized that, because Verducci's prior trials had ended in repeated jury deadlock, another trial on the same charges would not violate the double jeopardy clauses of the federal and state Constitutions.  It also proceeded on the apparent assumption that it had the authority and discretion to dismiss if a fourth trial was not "in furtherance of justice," considering the relevant factors in balancing a defendant's rights with the interests of society as a whole, but declined to dismiss.  The trial court provided a well-reasoned explanation for its decision.  It specifically examined the nature of the charges, discussed the strength of the evidence, considered the burdens imposed on Verducci by retrial, and the likelihood that additional evidence would be presented at a fourth trial.

Verducci does not contend that any of the factors considered by the court were not relevant to the exercise of its discretion.  He merely contends that the trial court should have given more weight to his interests.  We will not second guess the trial court's ruling, which found particularly relevant the strength of the People's evidence, the seriousness of the charges, and the limited prejudice to Verducci of a fourth trial.[14]  We find no abuse of discretion in the court's ruling.

---

[14] Retrial after a hung jury—or even several hung juries—"does not necessarily inconvenience defendants . . . ; they do not face emotional trauma caused by multiple, lengthy trials.  A continuation of the same proceeding after mistrial simply does not present the same degree of stigmatization and humiliation; indeed, such a retrial should be expected, as compared to the unknowing defendant who can only guess at what lies ahead when the state fails to join charges into one proceeding. [¶] . . . In such cases the state's interest in enforcing its laws and ensuring public order outweighs the burden borne by the defendant who must once again face the prosecutorial machinery of the state." (*People v. Williams* (1987) 195 Cal.App.3d 398, 407–408, fn. omitted.)

B.      *Admission of the January 13, 2007 Phone Call\*\**

Verducci also contends the trial court abused its discretion in admitting evidence of the January 13, 2007 phone call between Coby and Whisenhunt, over his hearsay objection.  He asserts admission of the evidence violated his due process rights.

We review evidentiary rulings, including those involving hearsay, for abuse of discretion.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805; *People v. Waidla* (2000) 22 Cal.4th 690, 725.)  When a trial court's decision rests on an error of law, it is necessarily an abuse of discretion.  (*People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 746.)  Although Verducci did not raise his constitutional argument at trial, he may argue that the asserted abuse of discretion had the additional legal consequence of violating due process.  (*People v. Partida* (2005) 37 Cal.4th 428, 435.)  "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."  (*Id.* at p. 439.)

1.      *Background*

The court conducted a pretrial hearing on the admissibility of the January 13, 2007 jailhouse phone call from Coby to Michael Whisenhunt.  The prosecutor's theory was that the evidence was "critical" to link Verducci to the cell phone that used the same cell phone tower as Thomas's cell phone a few minutes before the shooting.  The prosecutor offered, "[T]his is a recorded phone call where [Verducci] is being reached on that cell phone the night before the murder."  However, she conceded that Verducci's voice cannot be heard on the recorded call.

Verducci's trial counsel objected on hearsay and relevance grounds, pointing out that Whisenhunt did not have any recollection of the call and that Whisenhunt could not identify Verducci's voice on the recorded call.  The prosecutor argued there was sufficient foundation that Whisenhunt was speaking to Verducci because Coby specifically asked for "Joe Rue" and there was evidence Verducci used that moniker.  Verducci's trial counsel clarified, "I'm objecting to any hearsay information contained,

---

\*\* See footnote *, ante*, page 1.

18

whoever it may come from; whether it comes from Coby Phillips, Mike Whisenhunt, whoever these female voices are on the other line . . . and all the information they allegedly impart. [¶] Again, it sounds like most of it . . . is coming from [Whisenhunt], who claims, by context, to be reiterating what he's being told by some other person. And [Whisenhunt] has no memory of that happening. [¶] So any factual information I object to as hearsay. Anything being offered for the truth anywhere in this recording I object to as hearsay."

The trial court ruled the statements in the phone call were mostly admissible as party admissions, finding sufficient evidence that Whisenhunt spoke with Verducci. The court said: "That's where I get back to: Is there a sufficient foundation from which the jury, as the finder of fact, could conclude that the speaker that [Whisenhunt] was speaking to was [Verducci]. And I actually think based upon what I've heard so far, not just from the witness, but other evidence in the case, I think there is. [¶] But I also think if I allow this, I should give a limiting instruction that tells the jury if they conclude that [Whisenhunt] was not speaking to [Verducci], they should disregard all of these statements and not consider them for any purpose." The trial court also found Coby's statements to be admissible under Evidence Code section 1250.[15]

The jury was instructed to consider the evidence for limited purposes, as follows: "So ladies and gentlemen, the recording you heard is one of these limited purpose pieces of evidence. It's being admitted for the limited purposes of showing or not showing Coby Phillips's state of mind, issues like intent, plan, knowledge, that sort of thing.

"Also it's being admitted for the limited purpose of conditionally, basically, for this limited purpose of establishing statements from [Verducci]. And I'll get back to that

---

[15] "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

in just a minute.  Also, showing the circumstances under which someone in a county jail can communicate with outsiders.

"And there may be one or two other limited purposes that I've just forgotten at this point.  If so, I'll admonish you later about them.

"So you're to consider the evidence for those limited purposes and for no other purpose.  And if you don't hear me tell you that there is another permissible limited purpose, then just the three I indicated.

"With respect to the limited purpose attributing certain statements to [Verducci], *you can only attribute those statements to* [*him*] *if you believe or conclude that the People have proved that it was* [*Verducci*] and not somebody else on the line with [Whisenhunt].

"You'll also have to, in order to make that leap, conclude that the People have proven that [Whisenhunt] was in fact the person who was one of the voices on the telephone conversation. [¶] *And if you conclude that* [*Whisenhunt*] *was not speaking to* [*Verducci*] *then you're to disregard in their entirety, any statements that the recording attributes to the person named Joe or Joe Rue*."[16]  (Italics added.)

2.      *Analysis*

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] Except as provided by law, hearsay evidence is inadmissible."  (Evid. Code, § 1200, subds. (a), (b).)  However, "[e]vidence of an out-of-court statement is . . . admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute." (*People v. Davis* (2005) 36 Cal.4th 510, 535–536.)

---

[16] In its jury instructions, the trial court reiterated, "certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other."  It also instructed:  "You have heard evidence that [Verducci] made oral or written statements before the trial.  You must decide whether [Verducci] made any of these statements, in whole or in part.  If you decide that [Verducci] made such statements, consider the statements, along with all the other evidence, in reaching your verdict."

20

Verducci challenges the trial court's ruling that the evidence was admissible for the limited purposes of showing state of mind and any admissions made by Verducci, if the jury believed it was Verducci on the other end of the call. In arguing the trial court abused its discretion, Verducci contends that "anything said by someone who called Whisenhunt and anything said by anyone answering Whisenhunt's phone call" is hearsay. Although he never indicates what particular statements he challenges, he contends the trial court improperly admitted statements made by people other than a witness testifying in court to prove: (1) the truth of the implied assertion that the man who spoke to Whisenhunt was Verducci; (2) the truth of Coby asking Verducci to stay at his house and protect his kids and that Verducci agreed to do so.

The contents of the phone call were admissible to show the implied truth that it was, in fact, Verducci on the other end of Whisenhunt's cell phone call. Although his briefs are not entirely clear, Verducci appears to be arguing that any statement "Joe" made in answering the phone in response to "put [Joe Rue] on the phone" is hearsay. However, we agree with the People that any such statement was conditionally admissible as an admission. (See Evid. Code, § 1220 ["[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party"].) Whisenhunt was unable to identify Verducci's voice, as he testified that he had never met Verducci. And the (707) 712-1152 phone number was not registered to Verducci. However, the jury was instructed to only consider any statements made by "Joe" as admissions, if they believed that Whisenhunt was in fact talking to Verducci.

When the admission of evidence is dependent upon the existence of preliminary facts, the procedure for establishing those facts is set out in Evidence Code sections 400 through 405. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 60.) The determination of whether the statements were actually made by Verducci was properly left to the jury. (Evid. Code, § 403, subd. (c).) In this situation, "the proffered evidence is inadmissible unless the trial court finds there is sufficient evidence to sustain a finding of the existence of the preliminary fact. [Citation.] That is, the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary

21

fact by a preponderance of the evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1120, disapproved on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion." (*Guerra*, at p. 1120.)

" 'The court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury." ' [Citations.] 'The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion.' " (*People v. Herrera, supra*, 83 Cal.App.4th at p. 62.) Here, it is simply not true that the "only proof" Verducci was on the other end of the phone was the content of the call itself. Prior to the conditional admission of the January 13 phone call evidence, Clayton had testified that Verducci used the disputed phone number. Stacey's prior testimony, admitted in the defense case, corroborated Clayton's testimony. Thus, the record contains sufficient evidence from which the jury could infer Whisenhunt was talking to Verducci. (See *People v. Hess* (1970) 10 Cal.App.3d 1071, 1078 ["[t]he identity of a party to a telephone conversation may be established by circumstantial as well as direct evidence," and "contents of the telephone conversation itself may be considered in relation to other evidence to establish the identity of the speaker"].)[17]

---

[17] Verducci's reliance on *People v. Douglas* (1990) 50 Cal.3d 468 and *People v. Scalzi* (1981) 126 Cal.App.3d 901 do not advance his argument, as neither case involves an admission of a party. The declarants in both cases were undisputedly *not* the defendant. (*Douglas,* at p. 514; *Scalzi,* at p. 906.)

Admittedly, Tina's statement via Whisenhunt that "she's with Joe" was also offered for the truth of her statement. However, the trial court concluded the statement was admissible as a contemporaneous statement to explain Tina's behavior—answering the phone and putting "Joe" on the phone. (See Evid. Code, § 1241 ["[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Is offered to explain, qualify, or make understandable conduct of the declarant; and [¶] (b) Was made while the declarant was engaged in such conduct"]; *People v. Marchialette* (1975) 45 Cal.App.3d 974, 978–980 [statements overheard by witness during telephone conversation with victim were verbal acts admissible to explain declarant's conduct while declarant engaged in such conduct]; but see *People v. Hines* (1997) 15 Cal.4th 997,

As best we can discern, Verducci's objection is actually to the other layers of out-of-court statements, as this three-way call contained "Joe's" statements to Whisenhunt, Whisenhunt's statements to "Joe" and Tina, and Whisenhunt's statements to Coby repeating "Joe's" statements. When evidence consists of multiple layers of out-of-court statements, the evidence is admissible if each layer separately meets the requirements of a hearsay exception or is not offered for the truth. (*People v. Arias* (1996) 13 Cal.4th 92, 149; *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1204–1205.)

The People argue that any statements within the call attributed to Whisenhunt are not hearsay because he testified at trial. This is not an accurate statement of the law. (Evid. Code, § 1200, subd. (a) [" '[h]earsay evidence' is evidence of a statement that was made *other than by a witness while testifying* at the hearing and that is offered to prove the truth of the matter stated" (italics added)].) Nonetheless, we cannot agree that Whisenhunt's instruction to "put [Joe Rue] on the phone" is hearsay. Requests and words of direction do not assert the truth of any fact and cannot be offered to prove the truth of the matter stated. (*People v. Jurado* (2006) 38 Cal.4th 72, 117.)

Furthermore, Whisenhunt's repetition of "Joe's" out-of-court statements did not create another level of hearsay. It is clear from the circumstances of the phone call and Whisenhunt's testimony at trial that Whisenhunt served merely as a conduit between "Joe" and Coby, with no motive to distort. In similar circumstances, authorized or translated statements are considered to be the statements of the original declarant, not that of the conduit. (See Evid. Code, § 1222 ["[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain finding of such authority or, in the court's discretion as

1034–1035 & fn. 4 [victim's statement on telephone call regarding who she was with was not admissible to explain her conduct because the victim's conduct was not in issue].) Verducci raises no challenge to this aspect of the trial court's ruling.

to the order of proof, subject to the admission of such evidence"]; *Dincau v. Tamayose* (1982) 131 Cal.App.3d 780, 790 [statements made by husband to nurse in joint endeavor to care for sick child were implicitly authorized admissions of wife]; *Correa v. Superior Court* (2002) 27 Cal.4th 444, 448 ["a generally unbiased and adequately skilled translator simply serves as a 'language-conduit,' so that the translated statement is considered to be the statement of the original declarant, and not that of the translator"]; *People v. Torres* (1989) 213 Cal.App.3d 1248, 1258 ["[w]hen two persons speaking different languages select an interpreter as a medium of their communication, the interpreter is regarded as their joint agent for that purpose [and] the statements of the interpreter 'are regarded as the statements of the persons themselves' "].) Because Whisenhunt similarly acted as an agent or mere conduit for "Joe's" statements, the trial court did not abuse its discretion in treating Whisenhunt's statements as those of "Joe" himself.

The second part of Verducci's argument is that the trial court admitted hearsay by admitting evidence Coby asked "Joe" to stay at his house to protect his kids, and that "Joe" agreed to do so. We cannot agree. After Coby says, "[p]ut [Joe Rue] on the phone," Whisenhunt acts as go-between in a conversation between Coby and "Joe Rue." During that conversation, Coby expresses, and Whisenhunt conveys to "Joe Rue," Coby's desire that Joe Rue protect Coby's children because Thomas is out of jail. Whisenhunt says, "[Joe] said he is staying [at Coby's house]."

None of these out-of-court statements are hearsay. Coby's request that Verducci stay at his house and protect his kids is admissible evidence of state of mind, regardless of the statement's truth. The evidence was properly admissible for that purpose. (See Evid. Code, § 1250, subd. (a); *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 ["a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay[;] [i]t is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind"].) Coby's out-of-court statements—showing that he was fearful for his children's safety after Thomas's release from jail and that Coby's fear was communicated to Verducci—tend to suggest

24

Verducci had a motive to kill Thomas.[18]  (*People v. Riccardi* (2012) 54 Cal.4th 758, 820–821 [direct evidence of declarant's state of mind (e.g., statements that she was "terrified" of defendant) is admissible under Evid. Code, § 1250 to prove defendant's motive if there is independent, admissible evidence that prior to the crime the defendant was both aware of and possibly motivated by declarant's state of mind].)  The evidence was highly relevant to the prosecution's theory of how and why the victim was killed, and the trial court properly gave a limiting instruction that told the jury it could only consider the evidence for such purposes.  (*Riccardi,* at pp. 820–821*;* Evid. Code, § 355.)

As previously discussed, Whisenhunt's comment that "[Joe] is staying [at Coby's house]" could be admitted for its truth as a party admission, if the jury found Whisenhunt was, in fact, talking to Verducci.  (Evid. Code, § 1220.)  The trial court did not abuse its discretion in admitting the disputed evidence.  No due process violation has been shown.

### III.    DISPOSITION

The judgment is affirmed.

---

[18] Verducci does not contend in his opening brief that evidence of Coby's state of mind is irrelevant or make any other cogent argument for why the statements should not have been admitted under Evidence Code section 1250—the basis of admissibility identified by the trial court.  He forfeited any such argument by waiting to raise it in his reply brief.  (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [arguments not raised in opening brief need not be considered].)

_____

BRUINIERS, J.


WE CONCUR:


_____

SIMONS, Acting P. J.


_____

NEEDHAM, J.


A140040

26

Superior Court of Solano County, No. VCR195548, E. Bradley Nelson, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.