Filed 1/27/25  P. v. Alamillo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EVERARDO MEZA ALAMILLO,<br><br>    Defendant and Appellant. | 2d Crim. No. B333228<br>(Super. Ct. No. CR34740)<br>(Ventura County) |

A jury found Everardo Meza Alamillo guilty of two counts of first degree murder.  (Pen. Code, § 187, subd. (a).)  The jury also found multiple aggravating circumstances (Cal. Rules of Court, rule 4.421), and that Alamillo personally used a firearm (Pen. Code, § 12022.5, subd. (a)).  The trial court found true a multiple murder special circumstance for each count of murder.  (*Id.* § 190.2, subd. (a)(3).)  The court sentenced Alamillo to two life terms without the possibility of parole plus 10 years.

We strike one of the two multiple murder special circumstances.  In all other respects, we affirm.

FACTS

On October 14, 1993, at 4:18 a.m., the police responded to a call from a house in Santa Paula. Police found the bodies of Armando Cauich and Adriana Meza lying on a bed. The two-year-old daughter of Meza and Alamillo was crying and trying to get Meza to hold her. Meza and Alamillo were married but separated. Meza had been shot three times in the back at close range. Cauich had been shot twice in the head at close range.

There was no sign of a struggle or forced entry. The back door was partially open. Alamillo's fingerprints were found on the doorknob. Alamillo's car was parked nearby. It would not start because its battery was dead. Two unfired .22-caliber bullets were found in Alamillo's home. The bullets were of the type recovered from Meza's and Cauich's bodies.

On October 12, 1993, Alamillo withdrew $1,000 from his savings account and cashed two checks worth $1,097. Alamillo had not shown up for work since the murders, did not pick up his paycheck, cash in his vacation hours, or retrieve money from his retirement account. At the time, Alamillo had been living with his cousin. The last time his cousin saw him was between 7:00 p.m. and 8:00 p.m. the night before the murders. Alamillo was arrested in Mexico in November 2015.

*1991 Battery*

David Kemp was a police officer with the City of Santa Paula in 1991. On October 29, 1991, he went to an apartment in Santa Paula responding to a dispatch "in reference to a battery." Meza let him in. Kemp asked Meza to identify her husband. Meza identified Alamillo. Alamillo sat at the kitchen table eating. He did not get up to greet Kemp, nor did he act surprised that Kemp was there. As Kemp spoke with Meza, he noticed she

2

had some redness on her cheek and some swelling. Kemp did not take pictures because usually that type of injury will not show up until the next day.

*Martha Macias*

Martha Macias and her family were good friends with Cauich and his family. Meza had recently separated from Alamillo and needed a place to live. In July 1993, Meza and her daughter moved in with Macias and her family. Meza and her daughter lived in one bedroom of Macias's Santa Paula home, and Macias and her family lived in the other bedroom. Alamillo came to visit his daughter often. Cauich frequently came by to give Meza a ride to Round Table Pizza where they both worked.

In August 1993, on two occasions, Macias heard Alamillo shout at Meza. Alamillo threatened to kill Meza and Cauich if he saw them together. He said their families would be crying "tears of blood."

Macias recalled that on one occasion Meza and Cauich told her that Alamillo had hit the car they were in with his car. They both appeared nervous and afraid when they told her. The incident happened a few minutes before Meza and Cauich told Macias.

*Jooley Pena*

Jooley Pena worked with Meza and Cauich at Round Table Pizza. Shortly after Meza and Alamillo were married in 1991, Pena began noticing Meza had injuries, including a black eye and bruises. Pena and another coworker urged Meza to leave Alamillo because of her injuries.

After Meza and Alamillo separated, Meza told Pena about an incident the day after it happened. Alamillo was driving Meza and their daughter on Highway 126 toward Filmore. Alamillo

3

started driving at about 100 miles per hour. He said they were going to die together. He said he was going to kill her and that if he could not have her no one would have her. Meza appeared afraid and crying as she told this to Pena.

Pena would often see Alamillo outside of Round Table Pizza when she was working with Meza and Cauich. Cauich told Pena of about 10 to 15 instances when Alamillo was following him and Meza.

Cauich told Pena that one night he stood guard outside of Meza's house to make sure Alamillo did not show up to harm Meza and their daughter.

### *Dwylene Zapparelli*

Dwylene Zapparelli and Meza were good friends. Zapparelli worked with Meza and Cauich at Round Table Pizza. Zapparelli testified that in August 1993 Meza called her to pick her up at Meza's mother's house. When Zapparelli arrived, Alamillo was yelling at Meza. Meza was terrified. She was crying and shaking and desperate to get away. Meza took her daughter and got into Zapparelli's car.

When they were driving away, Meza told Zapparelli what happened. Alamillo drove on Highway 126 with Meza and their daughter in the car. Alamillo drove about 100 miles per hour and taking corners very fast. He told Meza he was going to kill her and that if he could not have her nobody could. Meza got Alamillo to calm down by telling him they would get back together. They ended up at Meza's mother's house. Meza told Zapparelli about the incident the night it happened, not the next morning.

Zapparelli recalled that around September 1993, Alamillo knocked on the door of Round Table Pizza before it opened.

4

Zapparelli refused to let him in.  Alamillo yelled at Meza while Zapparelli was standing there.  At least three to five times Zapparelli saw Alamillo parked outside Round Table while Meza was at work.

### Antoinia Cauich

Antoinia Cauich is Cauich's mother. Cauich and Meza told her they were afraid of Alamillo.  Cauich told his mother that Alamillo had threatened him.  One day Cauich and Meza came running home.  They appeared scared.  They said Alamillo chased them in his car all the way to the city of Fillmore.

After Meza and Alamillo separated, Cauich's mother saw Alamillo drive by her house several times.

### Jose Anaya

Jose Anaya is an accountant.  He also helps people fill out paperwork, including divorces.  Meza told Anaya she was afraid of Alamillo and that he was constantly following her.  She wanted a divorce.  Anaya suggested that she also get a restraining order.  Meza was supposed to meet with Anaya on October 14, 1993, to finalize the paperwork.  Meza never appeared.

### Marina Castanon

Marina Castanon is Meza's sister.  She is also married to Alamillo's cousin.  On October 13, 1993, Castanon and her husband were planning to move into the Santa Paula house where the murders would occur the next morning.  At about 9:00 p.m. Alamillo knocked on the window of the place where the Castanons were staying.  Castanon's husband went outside to talk to Alamillo.  Castanon did not go outside with him.  When Castanon's husband returned, he told her they were not moving into the Santa Paula house.  He did not give a reason.  Castanon's husband did not allow her to call Meza that night.  He

said she could call Meza the next day. The next morning the police arrived and told Castanon that Meza had been killed. Castanon's husband did not appear surprised.

### *Defense*

Alamillo chose not to testify on his own behalf. His counsel conceded Alamillo killed Meza and Cauich, but argued it was heat of passion manslaughter.

Some of Meza's closet friends did not know Meza and Cauich were in a romantic relationship. Alamillo's counsel argued that on the last day prior to the shootings, Meza spent time with Alamillo and seemed happy with him.

A coworker of Alamillo testified that a couple of days after the $2,000 bank withdrawal, Alamillo planned to test-drive a car for a possible purchase, but did not show. Officer Kemp testified that sometimes people carry guns to protect large sums of cash.

Castanon did not report her husband's conversation with Alamillo until October 2016.

## DISCUSSION

### *I. Retrial on First Degree Murder Was Not Barred*

Alamillo contends his retrial on first degree murder was barred because the jury found him not guilty of that charge in the first trial.

### *(a) Background*

After two days of deliberation, the jury sent a note to the court stating it was having difficulty moving forward. In the presence of the jury, the court asked the foreperson if the jury was deadlocked at present. The foreperson responded that it was. The trial court suggested that the jury take a break and resume deliberations the next morning.

6

The jury resumed deliberations the next day and sent the trial court several notes relating to second degree murder and voluntary manslaughter. The court answered the jury's questions.

Later that day, the jury sent the trial court a note stating it was unable to reach a unanimous decision. In the presence of the jury, the foreperson stated there were three "formal votes" which were 11 to one, and that had not changed for a day. The other jurors agreed that the deliberations had remained static for at least a day. The court asked if there was anything the court could do to assist deliberations. The jurors indicated that there was not. The court declared a mistrial and dismissed the jury.

After the jury was dismissed, the prosecutor moved for a retrial. Defense counsel stated he wanted to know the direction of the 11-to-one split. The trial court apologized because it said it would ask the jury but forgot to do so. The court asked the bailiff to get the foreperson. When the foreperson returned to court, the court asked which way the 11 to one split went. The foreperson replied that there were 11 votes for second degree murder and one for manslaughter. The court then asked if there was a unanimous decision on first degree murder. The foreperson replied yes; Alamillo was not guilty of first degree murder.

Defense counsel moved that any retrial exclude first degree murder. The prosecutor objected that the jury had not filled out a verdict form acquitting Alamillo of first degree murder. The trial court deferred ruling until the next day.

Defense counsel sent the trial court an email asking that it reconvene the jury. The prosecutor objected that the court lacked jurisdiction to reconvene the jury because it had been dismissed. The prosecutor stated that the prosecutorial team had

7

discussions about the foreperson's statements with eight jurors who stayed behind after the jury had been dismissed. The jurors stated that the evidence could have supported a finding of first degree murder, and the discussion of second degree murder was an attempt to reach a compromise.

The trial court granted the prosecution's motion for a retrial and denied the defense motion to exclude first degree murder. The court noted that the foreperson was not under oath when she said that the jury unanimously agreed that Alamillo was not guilty of first degree murder. The court also found it was not clear whether the foreperson's statement was the result of her own assessment of the jury's votes. The court excluded the foreperson's statement and the prosecutor's statement about what the eight jurors told him. The court found that the jurors' notes were consistent with an attempt to reach a compromise verdict. Finally, the court assumed that the jury had followed its instructions and did not return a verdict form because it did not reach a verdict on first degree murder.

## (b) Double Jeopardy

Both the United States and California Constitutions provide that a person may not be twice placed in jeopardy for the same offense. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Both provisions permit retrial following discharge of a jury that has been unable to agree on a verdict. (*People v. Fields* (1996) 13 Cal.4th 289, 300.)

Alamillo's double jeopardy claim is based on the foreperson's statement that the jury agreed he is not guilty of first degree murder. Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements

made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

The foreperson's statement, having been made after the jury was discharged, was unsworn. (See *People v. Bonillas* (1989) 48 Cal.3d 757, 771 [regardless of whether the discharge may be erroneous, once the jury is discharged, the jurors are free from any official obligations].) An unsworn statement is not admissible under Evidence Code section 1150 to impeach the jury's verdict. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1468.) Evidence that violates Evidence Code section 1150 is not only inadmissible, but also irrelevant and of no jural consequence. (*People v. Johnson* (2013) 222 Cal.App.4th 486, 494.) In other words, the foreperson's statement is a nullity.

Moreover, the jury was instructed with CALCRIM No. 640, which provides in part:

"If all of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms [for that count]. [¶] . . . [¶]

"If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms for that count."

9

We presume the jury followed the trial court's instructions. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 205-206.) Following the court's instructions, the jury did not return any verdict form because it could not agree whether Alamillo was guilty of first degree murder. Had the jury agreed Alamillo was not guilty of first degree murder, it would have returned a verdict form so stating.

As our Supreme Court stated in *People v. Aranda* (2019) 6 Cal.5th 1077, 1095, there is a reason why we have statutes that formalize the receipt of a verdict. A report by any juror may merely reflect his or her impressions, gleaned from discussions. (*Ibid*.) Standardized instructions provide a framework for securing a formal response from the jury to facilitate the receipt of partial verdicts. (*Ibid*.) That the jury did not return a formal verdict of not guilty here shows the foreperson's statement merely reflected her impressions gleaned from discussions.

### (c) Abuse of Discretion

Alternatively, Alamillo contends the trial court abused its discretion in declaring a mistrial and discharging the jury.

Alamillo argues that Evidence Code section 1150 expressly excludes the prosecutor's hearsay statement that eight jurors told him that the jury did not reach an agreement on first degree murder. But the trial court excluded the prosecutor's statement.

The trial court found that "[t]he Evidence Code precludes the admission and consideration of [the prosecutor's] statements about what was conveyed to him by jurors . . . ."

Contrary to Alamillo's argument, the prosecutor's statement did not affect the trial court's ruling excluding the foreperson's statement. The court excluded the foreperson's

10

statement because it was unsworn and contradicted by the jurors' notes and the jury instructions.

Alamillo argues that Evidence Code section 1150 does not support denying the defense motion to reconvene the jury. But the trial court's denial of the motion was not based on Evidence Code section 1150. It was based on the discharge of the jury. The trial court loses control over a jury as soon as the jury is discharged. (*People v. Bonillas*, *supra*, 48 Cal.3d at pp. 770-772.) Once the jury is out of the court's control, the court has no jurisdiction to reconvene the jury. (*People v. Jones* (2023) 89 Cal.App.5th 1344, 1348.) Reconvening the jury was simply beyond the power of the trial court.

Alamillo argues the trial court's conduct was not in accordance with Penal Code sections 1023, 1140, 1163, and 1164.

Penal Code section 1023 does nothing more than codify the double jeopardy rule.

Penal Code section 1140 provides in part: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, . . . unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

Here, after three days of deliberation, the jury reported it was unable to reach a verdict and there was nothing the trial court could do to assist. The court was well within its discretion in declaring a mistrial and discharging the jury.

Penal Code section 1163 provides: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severely asked whether it is their verdict, and if any one answer in the

11

negative, the jury must be sent out for further deliberation." No verdict was rendered and neither party asked that the jury be polled. The court need only inquire of the foreperson and the jury as a whole whether the jury is deadlocked; the court need not poll each juror individually. (*People v. Rojas* (1975) 15 Cal.3d 540, 546.)

Penal Code section 1164, subdivision (b) provides in part: "No jury shall be discharged until the court has verified on that record that the jury has either reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limited to, the degree of the crime or crimes charged . . . ."

Alamillo argues that the jury did not formally declare its inability to reach a verdict on all the issues including the degree of the crime. But here the foreperson told the trial court that the jury had taken three "formal votes" and were unable to agree. Neither the foreperson, nor any other juror, mentioned any votes, formal or otherwise, in which the jury was able to agree that Alamillo was not guilty of first degree murder.

The trial court has no duty to inquire about the possibility of a partial verdict unless the jury has given some affirmative indication that it has acquitted on a greater offense but deadlocked on a lesser offense. (*People v. Aranda*, *supra*, 6 Cal.5th at p. 1094.) Here the jury gave no such affirmative indication. In fact, the jury pursuant to the court's instructions returned no verdict form.

The trial court fulfilled its statutory duties before discharging the jury. Alamillo cites no authority requiring the trial court to inquire about the direction of the jury's 11-to-one vote split.

12

*(d) Counsel's Representation*

Alamillo contends he received ineffective assistance of counsel.

In assessing a claim of ineffective assistance of counsel, we must determine whether counsel's representation fell below the standard of reasonableness under prevailing norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) If counsel's performance was ineffective, we must determine whether there is reasonable probability that absent the error the defendant would have obtained a more favorable result. (*Id.* at p. 695.)

Alamillo argues that competent counsel would have ensured the trial court inquired as to the direction of the jury's vote prior to discharge. But defense counsel asked the trial court to inquire, and the trial court forgot to do so. Ordinarily it is not essential that the inquiry into the jury's split vote be made prior to discharge. That information is usually available after discharge by directly asking the jurors. Prior to the jury's discharge, counsel could not have known the foreperson would assert after discharge that the jury agreed Alamillo was not guilty of first degree murder. The foreperson had just minutes before informing the court that the jury could not agree. Defense counsel did remind the court to inquire of the foreperson as to the 11-to-one vote split.

Alamillo argues that the jury's notes to the trial court inquiring about the difference between second degree murder and manslaughter made it especially important to inquire about the direction of the jury's split vote. But the notes to the trial court show only that some members of the jury were considering second degree murder and manslaughter. They do not show the jury agreed on anything. Counsel could reasonably rely on 1) the

13

jury's pre-dismissal assertion that it was unable to agree on a verdict and, 2) the court's instructions requiring a not guilty verdict form as to first degree murder.

*(e) Harmless Error*

There is no evidence that the jury found Alamillo not guilty of first degree murder.  Nevertheless, Alamillo argues that errors by the trial court and the incompetence of his counsel mandate his first-degree murder conviction be overturned.  There was no error by the court or incompetence of his counsel.  But if there were such errors and the errors were prejudicial, the remedy would be a new trial.  (See 6 Witkin, Cal. Criminal Law (5th ed. 2024) Criminal Appeal, § 189, p. 452 ["A general reversal of a judgment of conviction sends the case back for a new trial"].)  Alamillo has had a new trial.  He cites no authority for dismissing his first degree murder conviction based on alleged errors that occurred in a previous trial.

Alamillo's reliance on *People v. Verducci* (2016) 243 Cal.App.4th 952 is misplaced.  Three prior trials of the defendant resulted in mistrials because the jury was deadlocked.  Prior to the fourth trial, the defendant moved for dismissal on due process grounds.  The trial court denied the motion, and a jury convicted the defendant of first degree murder.  The court also denied a post-verdict dismissal motion.  On appeal, the defendant claimed his right to due process was violated because through the sequence of trials the prosecution learned the defense strategy and was able to fine-tune its case to obtain a conviction.  The Court of Appeal stated, "We will assume without deciding that the trial court had direction to dismiss the action against [the defendant]." (*Id.* at p. 967.)  Nevertheless, the Court of Appeal

14

determined that the trial court did not abuse its discretion in refusing to dismiss. (*Ibid*.)

*People v. Verducci*, *supra*, 243 Cal.App.4th 952 does not stand for the proposition that the courts have discretion to dismiss the case. The Court of Appeal expressly refused to decide the matter. Even if we have discretion, Alamillo presents no grounds for dismissing his first-degree murder conviction.

## II. Hearsay

Alamillo contends the trial court erred in admitting inadmissible hearsay.

Evidence Code section 1200, subdivisions (a) and (b) provide:

"(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

"(b) Except as provided by law, hearsay evidence is inadmissible."

Evidence Code section 1240, subdivisions (a) and (b) state the "spontaneous statement" exception to the hearsay rule as follows:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

The spontaneous statement exception requires: " ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective

15

powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."  [Citations.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 925.)

Evidence Code section 1250, subdivisions (a) and (b) state the declarant's existing mental or physical state exception in part as follows:

"(a) [E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

The trial court's decision to admit evidence under an exception to the hearsay rule is reviewed for an abuse of discretion.  (*People v. Kopatz* (2015) 61 Cal.4th 62, 85.)  The abuse of discretion standard requires a showing that the court's ruling was arbitrary, capricious, and exceeding the bounds of reason.  (*People v. Torres* (2020) 47 Cal.App.5th 984, 988-989.)

*(a) 1991 Battery*

Alamillo contends Officer Kemp's testimony that he responded to a dispatch "in reference to a battery" constitutes double hearsay: what Meza told dispatch and what dispatch told Kemp.  But the statement was not introduced for the truth of the

16

matter. It was introduced to show why Kemp went to Meza's apartment.

When Kemp arrived, he testified that he could see that Meza had been the victim of a battery. Her cheek was red and swollen. The marks were too fresh to be visible on a photograph. That Alamillo ignored Kemp shows Alamillo knew why Kemp was there. If it was error to admit the phrase "in reference to a battery," it was harmless by any standard. There had clearly been a battery.

*(b) Meza's Statements to Anaya*

Alamillo contends Meza's statements to Anaya are inadmissible hearsay.

First, Meza's request to Anaya for help in obtaining a divorce and restraining order is not hearsay. "Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*People v. Jurado* (2006) 38 Cal.4th 72, 117 [request to provide a gun is not hearsay].)

Second, statements by Meza to Anaya that she was afraid of Alamillo are admissible under Evidence Code section 1250 as a statement of a declarant's existing mental feeling.

It appears Alamillo's real objection is relevance. He argues that seeking a divorce and requesting a restraining order are irrelevant absent evidence showing that he knew Meza was seeking a divorce and restraining order. Similarly, Alamillo argues that Meza's mental feeling is not at issue in this case.

Assuming the evidence was inadmissible, the error was harmless by any standard. There was admissible evidence that Alamillo battered Meza, threatened to kill her, took her and their daughter on a nightmare 100-miles-per-hour car ride, and was stalking her. The jury would not have been surprised to learn

17

that Meza was afraid of Alamillo and seeking a divorce and a restraining order.

*(c) Castanon's Testimony*

Alamillo contends that Castanon's testimony about her husband's conversation with him on the night of the murders is inadmissible hearsay.

Castanon testified that after her husband spoke to Alamillo at around 9:00 p.m. on the night of the murders, her husband told her they were not moving into the house where Meza and Cauich were staying, and that she could not call Meza until the next day. The statements were not introduced for the truth of the matter asserted, but to show that Alamillo planned the murders. Thus, they were not hearsay.

Alamillo argues that Castanon's statements were implied hearsay, citing *People v. Morgan* (2005) 125 Cal.App.4th 935, 943. If so, they were implied by Alamillo. Such statements are admissible against the defendant. (Evid. Code, § 1220; *People v. Davis* (2005) 36 Cal.4th 510, 535.)

*(d) Alleged Wrong Analysis*

Alamillo contends the trial court used the wrong analysis in admitting other hearsay statements.

Alamillo argues the trial court misinterpreted *People v. Riccardi* (2012) 54 Cal.4th 758 to conclude that hearsay statements were admissible because the victims were under stress and fear for the entire period. We agree that *Riccardi* does not stand for the proposition that hearsay is admissible simply because the victims were under stress and fear for a period of time. But the trial court did not entirely rely on its interpretation of *Riccardi*. If that were the case, the court would have admitted into evidence all of the prosecution's proffered

18

hearsay evidence. Instead, the court rejected at least one of the prosecution's proffered hearsay statements as lacking sufficient foundation to qualify under Evidence Code section 1240. We presume the trial court knows the applicable law. (*People v. Rodriquez Garcia* (2020) 46 Cal.App.5th 123, 176.) At least two of the statements challenged by Alamillo as admitted under the wrong analysis clearly qualify as spontaneous statements under Evidence Code section 1240.

(d)(1) Highway 126 Incident

Zapparelli testified Meza and her daughter were trapped in a car being driven by Alamillo at around 100 miles per hour while Alamillo threatened to kill Meza.

Anyone would be highly traumatized by such an incident and the trauma would not soon dissipate. Zapparelli testified she picked up Meza and her daughter on the night of the incident and not the next morning. Zapparelli could hear Alamillo still yelling at Meza when she arrived. Meza was crying, shaking, and desperate to get away. Meza told Zapparelli about the incident as they were driving. The trauma was severe and continuing. Meza had no time to reflect and contrive a story.

Alamillo's reliance on *People v. Ramirez* (2006) 143 Cal.App.4th 1512 is misplaced. In *Ramirez*, the victim met the defendant at a party. The victim left the party with the defendant and two of the defendant's friends in a car. Because they had been drinking, they decided to rent a hotel room. The victim passed out in the car and the defendant raped her between 2:00 a.m. and 4:30 a.m. Prior to 4:30 a.m., the victim and the defendant returned to the hotel room. The victim was clearly upset but said nothing about the rape to the friends who were staying in the room. The victim went into the bathroom and

19

showered for about 10 minutes. The victim and the defendant returned to the car at about 5:00 a.m. so the defendant could drive her home. The victim fell asleep in the car and awoke at 7:00 a.m. in a strange apartment. The aunt of the owner of the apartment arrived. The victim told the aunt that she had been raped. The aunt wanted to call the victim's brother, but the victim told her not to because her brother would kill her.

The majority of the appellate court in *Ramirez* determined that it was error for the trial court to admit the aunt's testimony under Evidence Code section 1240, that the victim told her she had been raped. Among the reasons, the majority stated that the victim's plea not to contact her brother showed that she engaged in a deliberate process. (*People v. Ramirez, supra*, 143 Cal.App.4th at p. 1525.) Although the majority determined it was error to admit the aunt's testimony, the error was deemed harmless. A concurring opinion disagreed with the majority's determination of error, as not giving sufficient deference to the trial court's findings. (*Id*. at pp. 1534-1535.)

We might be inclined to agree with the concurring opinion in *People v. Ramirez, supra*, 143 Cal.App.4th 1512, but it would be beside the point. The facts in *Ramirez* bear no relationship to the facts here. When Zapparelli arrived at Meza's mother's house, Alamillo was yelling at Meza. The trauma was ongoing. Meza was crying and shaking and desperate to get away. She told Zapparelli about the incident as they drove. Meza did not take a shower or sleep for hours between the incident and its telling. Nor did Meza tell Zapparelli not to tell anyone else.

Pena also testified that Meza told her about the Highway 126 incident the next day. Even assuming Pena's testimony about the Highway 126 incident does not qualify under Evidence

20

Code section 1240, any error was harmless. Pena's testimony about the incident was substantially the same as Zapparelli's testimony. Zapparelli's testimony about the incident was uncontroverted.

### (d)(2) Car Collision

Macias testified that Meza and Cauich told her that Alamillo hit the car they were in with his car. Both Meza and Cauich were nervous and afraid. It happened a few minutes before they told her. It is reasonable to conclude Meza and Cauich were still under the influence of a traumatizing event that occurred a few minutes before and had no time to reflect before speaking.

Alamillo argues the incident never occurred. There was no sign of damage to his car. But lack of a sign of damage goes to the weight of the evidence.

### (e) Harmless Error

The People concede that the trial court erred in admitting some hearsay evidence concerning Meza's and Cauich's general fear of Alamillo. But even if the trial court erred in admitting all of the evidence challenged as admitted under an invalid theory; and even if, as Alamillo contends, the trial court's rulings were unbalanced, any error would be harmless. The evidence against Alamillo is overwhelming.

Defense counsel admitted Alamillo killed Meza and Cauich. The only question was Alamillo's state of mind.

In August 1993, on two occasions, approximately two months before the murders, Macias heard Alamillo tell Meza that he would kill her and Cauich if he saw them together. That alone is overwhelming evidence of premeditation.

In addition, Alamillo was stalking Meza and Cauich. Coworkers of Meza and Cauich testified that they saw Alamillo on a number of occasions outside Round Table Pizza. On one occasion Alamillo knocked on the door before Round Table Pizza was open and demanded to speak to Meza. Cauich's mother also testified that she saw Alamillo drive by their home on a number of occasions.

Castanon testified that at about 9:00 p.m. on the night before the early morning murders, Alamillo came by her house to speak to her husband. After speaking with Alamillo, Castanon's husband told her they were not moving into the house where Meza was staying, and that she could not call Meza until the next day. The only reasonable conclusion is that Alamillo was planning the murders for that night or early the next morning.

Finally, Alamillo did not just happen to run into Meza and Cauich when he shot them. He deliberately entered the room where they were sleeping. He had no legitimate reason for entering the room, no less for entering the room with a gun. The only reason Alamillo had for entering the room with a gun was to carry out his plan to kill Meza and Cauich, as he had threatened to do.

### III. Vulnerable Victim Instruction

Alamillo contends the trial court erred in refusing his request to modify the particularly vulnerable victim instruction.

The trial court instructed the jury with CALCRIM No. 3226 as follows: "*Particularly vulnerable* includes being defenseless, unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree." Alamillo requested the court to add to the end of the sentence, "to an extent greater than other cases," in accordance with *People v.*

22

*Smith* (1979) 94 Cal.App.3d 433.  Alamillo points out that the current version of the instruction includes a similar phrase.

But the phrase "to the extent greater than other cases" is redundant.  The instruction used the term "*[p]articularly vulnerable*."  (CALCRIM No. 3226.)  That is plain English.  Even the case on which Alamillo relies, *People v. Smith, supra*, 94 Cal.App.3d 433, finds no problem with the unadorned term "*[p]articularly vulnerable*."  The Court of Appeal stated: "We find no vagueness in the term 'particularly vulnerable' and no difficulty in applying it here.  Particularly, as used here, means in a special or unusual degree, to an extent greater than in other cases.  Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.  An attack upon a vulnerable victim takes something less than intestinal fortitude.  In the jargon of football players, it is a cheap shot."  (*Id*. at p. 436.)

Moreover, the phrase requested by Alamillo creates the possibility of confusion.  It presumes the jurors are familiar with "other cases."

That the current version of CALCRIM No. 3226 contains a phrase similar to the phrase requested by Alamillo is irrelevant.  The version given by the trial court is entirely adequate (*People v. Smith, supra*, 94 Cal.App.3d at p. 436), and it does not require the jury to compare the facts of this case with "other cases."

Moreover, any error was harmless.  The jury found three other aggravating circumstances to be true: "that the crimes involved great violence, great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court, Rule 4.421(a)(1)); appellant was armed with and used a weapon (*ibid*.); the manner in which the crimes took

place involved planning, sophistication, and professionalism (*id.*, subd. (a)(8)).

### *IV. Multiple Murder Special Circumstances*

Alamillo contends one of the two multiple murder special circumstances must be stricken. The People concede the issue. No matter how many people are murdered, only one multiple murder special circumstance applies. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1150.)

### DISPOSITION

One of the two multiple murder special circumstances is stricken. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

BALTODANO, J.

CODY, J.

24

David R. Worley, Judge

Superior Court County of Ventura

_____

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.