Filed 8/28/25  P. v. Thomas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>SHERIDAN THOMAS, JR.,<br><br>        Defendant and Appellant. | C100341<br><br>(Super. Ct. No. LOD-CR-FECOD-2020-0013349) |

After his first trial ended in a mistrial, a jury found defendant Sheridan Thomas, Jr., guilty of first degree murder with a felony-murder special circumstance, as well as robbery and being a prohibited person in possession of a firearm.  The jury also found true a gun enhancement attached to the murder and robbery counts.  Defendant was sentenced to life without parole among other terms of imprisonment.  On appeal, he raises a variety of issues.  Finding merit in two sentencing claims, we modify the judgment to strike the minimum term of years imposed for his life without parole

1

sentence and stay sentence on defendant's robbery conviction. The judgment is affirmed as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 10:30 p.m. on November 13, 2020, Gurminder Singh Parmar was shot and killed in the convenience store he owned before the assailants took the cash register and fled. The murder and robbery were recorded on the convenience store's surveillance cameras. The footage from outside the store showed a dark-colored four-door sedan drive nearby before the shooting. A little over a minute later, two people walked across the parking lot toward the convenience store. About one minute after that, the two people ran back across the parking lot with one person holding a large object. The footage from inside the store showed one person entered the store wearing a distinctive backpack and mask. The person looked around for several seconds and then walked out of the convenience store. The person with the backpack then returned to the store followed by another person wearing a black hooded sweatshirt, black pants with a white stripe down the leg, a white beanie, and a white mask. The person dressed in black also had braids or dreadlocks protruding from under the hooded sweatshirt.

On the surveillance footage, the person with the backpack can be seen walking past Parmar, who was standing behind the front counter. The person dressed in black walked to the front counter and raised a handgun loaded with a high capacity magazine at Parmar. Parmar talked with the person holding the handgun for a few seconds before that person shot Parmar in the neck with a single bullet. Parmar fell to the floor and the person who shot him ran out the front of the store. The shooter returned shortly thereafter and watched the person with the backpack take the cash register from the counter. Both people then fled from the convenience store. Parmar died from the gunshot wound before help arrived. A .40-caliber casing was recovered from the scene.

Based on surveillance footage from nearby businesses taken around the time of the murder, investigating officers believed the dark-colored four-door sedan captured in the

2

convenience store's surveillance footage was a vehicle of interest. Officers later discovered the car belonged to Larry Thornton. When interviewed by police officers, Thornton initially denied any involvement in the robbery and murder. After some time, Thornton agreed to plead guilty to three counts of robbery and a gun enhancement in exchange for his truthful testimony at trial. Thornton testified at defendant's first trial that ended in a mistrial. Thornton's plea was taken, and he was sentenced to seven years in prison before testifying at defendant's second trial.

At defendant's second trial, Thornton testified he and his friend Maleek Carter-Rae had participated in two robberies together before the robbery of Parmar. On the night of the robbery and murder of Parmar, Thornton, Carter-Rae, Quinten Simmons, and defendant drove from Stockton to Woodbridge to steal cannabis. The plan to steal cannabis fell through and instead the group decided to steal cigars from a convenience store in Lodi. The group first went to a convenience store near Parmar's convenience store. Thornton parked the car, and Simmons and defendant went into the store. A few minutes later, Simmons and defendant got back into the car without having stolen any cigars. The group then decided to go to Parmar's convenience store to steal cigars. Thornton testified he did not know anyone was armed with a firearm.

Thornton testified that, when they got to Parmar's store, he parked the car and then defendant and Simmons got out to go into the convenience store. About two minutes later, defendant and Simmons returned to the car with a cash register. Thornton quickly drove away because it was obvious to him that defendant and Simmons did more than just steal cigars. Thornton testified he drove back to Stockton, stopping in a field on the way to dispose of the cash register. He then dropped Simmons off at an apartment complex and parked for a while until Carter-Rae and defendant could find a place to go. The group then went to a fast-food restaurant and then Thornton dropped Carter-Rae and defendant at a park before going home.

At the time of the robbery and murder of Parmar, Thornton's car was the subject of an unrelated warrant permitting officers to track its movements. The tracking information showed that, on the night of the murder, Thornton was at Carter-Rae's house from 9:47 p.m. to 9:50 p.m. before traveling to Woodbridge and arriving at 10:09 p.m. At the same time Thornton's car traveled to Woodbridge, Carter-Rae's and Simmons's cell phones utilized cell phone towers along the same route as Thornton's car. Defendant's cell phone did not utilize any cell phone towers the night of the murder.

At approximately 10:22 p.m., the car tracking data showed Thornton's car at the convenience store near Parmar's convenience store. This data was confirmed by surveillance footage from outside this convenience store, which showed the same two people who robbed Parmar entering the convenience store in the same way they entered Parmar's store. Specifically, the surveillance footage showed the person with the distinctive backpack enter the convenience store first, while the person in black waited outside. The person with the backpack looked around and left the store. Instead of reentering the convenience store with the person dressed in black, the two people returned to Thornton's car and the car left the parking lot. The tracking data next showed Thornton's car traveling to Parmar's convenience store and arriving at 10:25 p.m.

Approximately three minutes later, the car tracking data showed Thornton's car traveling away from the convenience store and toward Stockton. Before reaching Stockton, the car tracking data showed the car pulling off the main road before returning to the main road and continuing to Stockton. When officers searched the area where Thornton's car left the main road, they discovered a cash register. Once Thornton's car got to Stockton, the car tracking data showed it went to Simmons's house where it stayed for approximately five minutes. Simmons's cell phone also utilized a cell phone tower near his home at that time. During a later search of Simmons's bedroom, officers found the same distinctive backpack worn by one of the assailants in the surveillance footage depicting Parmar's robbery and murder.

4

Between 11:00 p.m. and 11:35 p.m., the car tracking data showed Thornton's car parked on a street near Simmons's house. Also during that time, Carter-Rae's cell phone utilized a nearby cell phone tower. At trial, defendant called two witnesses who testified he was known to stay at a house on the street where Thornton's car parked. At approximately 11:37 p.m., the car tracking data showed Thornton's car went to a fast-food restaurant and remained in that area for nearly 10 minutes. Surveillance footage from the fast-food restaurant showed defendant in the back seat of Thornton's car. After the fast-food restaurant, the car tracking data showed Thornton's car went to a nearby park.

A review of defendant's social media showed multiple messages between defendant and Carter-Rae in late October 2020 and early November 2020. In one message exchanged three days after the murder, Carter-Rae tells defendant that Thornton wants his gun back. Thornton testified he owned a .40-caliber handgun. In another conversation, defendant asked Carter-Rae to send him a picture of a shotgun. In another conversation, defendant told Carter-Rae of a music video he was recording at the same park Thornton testified he dropped Carter-Rae and defendant off at after the murder. A copy of defendant's music video without audio was played for the jury. In it, defendant can be seen wearing black pants with a stripe down the leg, much like the shooter depicted in the surveillance footage.

In two separate Instagram messaging chains occurring in late September 2020, defendant attempted to purchase a gun. In one conversation, defendant and another person communicated about defendant buying a variety of guns, including a nine-millimeter handgun, a .40-caliber handgun, and a "[T]aurus." After the person related the prices for all three guns, defendant said he wanted the .40-caliber handgun and an extended magazine holding 30 bullets. The person messaging defendant agreed, but later indicated he did not have the .40-caliber handgun to sell and could only sell a .22-caliber long rifle. During this same period of time, defendant messaged another

5

person asking to buy a gun larger than a nine-millimeter, which an officer testified would include a .40-caliber handgun as well as other types of guns.

A picture taken from defendant's Instagram account showed him in possession of an open handgun case with a .40-caliber Glock 23 inside of it. There was also a short video of two black handguns loaded with extended magazines. One handgun appeared to be a Glock, while the other appeared to be a Smith & Wesson. During a search of defendant's house, officers discovered an empty box for a .40-caliber Glock handgun, a tag belonging to a .40-caliber Smith & Wesson handgun, and a magazine for 10-millimeter ammunition.

Defendant was first tried in 2022. The jury could not reach a verdict, voting 11 to one in favor of acquittal. Defendant's second trial began in August 2023. The evidence was presented as set forth above. At the conclusion of trial, the jury found defendant guilty of premeditated first degree murder and found true a special circumstance that the murder was committed during the course of a robbery. The jury further found a gun enhancement attached to the murder charge true. As to the second count, the jury found defendant guilty of robbery and found true an attached gun enhancement. Finally, the jury found defendant guilty of possession of a firearm by a prohibited person.

At his sentencing hearing, defendant admitted a prior strike enhancement. The trial court then sentenced defendant to 50 years to life without the possibility of parole for the murder conviction, plus 25 years to life for the attached firearm enhancement. It then imposed a concurrent term for the robbery conviction and for the firearm possession conviction. It imposed 25 years to life for the gun enhancement attached to the robbery conviction, before staying it pursuant to Penal Code[1] section 654.

Defendant appeals.

---

[1] Further undesignated section references are to the Penal Code.

DISCUSSION

I

*The Trial Court Did Not Abuse Its Discretion*

*By Declining To Dismiss Defendant's Second Trial*

Defendant contends the trial court abused its discretion by failing to bar retrial after his first jury hung and a mistrial was declared because the evidence of his guilt was weak, the evidence was not expected to change at the second trial, and his first jury overwhelmingly sided with acquittal. Defendant does not base this argument on principles of double jeopardy, nor does defendant contend insufficient evidence was presented at his first trial. Instead the argument is premised on the Fourteenth Amendment to the United States Constitution and fundamental principles of fairness. We disagree the court abused its discretion.

A

*Background*

Defendant moved before his second trial to dismiss the charges against him and bar retrial in furtherance of justice under section 1385. Defendant argued the evidence had not changed since the first trial and the verdict of 11 to one in favor of acquittal demonstrated the prosecution would not be able to prove its case. The trial court denied the motion stating, "At this time, I am not going to exercise my discretion under [section] 1385 to dismiss any of the charges. The matter of which the jury trial was hung, regardless of the direction, it's within the [prosecution]'s right to retry the matter, so I'm not [going to] exercise my discretion under [section] 1385."

B

*There Was No Abuse Of Discretion*

Section 1385, subdivision (a) provides in relevant part, "The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." " ' "Dismissals under

7

section 1385 may be proper before, during and after trial." [Citation.] Because the concept of "furtherance of justice" (§ 1385) is amorphous, we have enunciated some general principles to guide trial courts when deciding whether to dismiss under section 1385. Courts must consider "the constitutional rights of the defendant, and the interests of society represented by the [prosecution]," and "[a]t the very least, the reason for dismissal must be 'that which would motivate a reasonable judge.' " ' " (*People v. Verducci* (2016) 243 Cal.App.4th 952, 962 (*Verducci*).)

In *Verducci*, the appellate court assumed without deciding that a bar to retrial through application of section 1385 was permissible if retrial would violate due process under the Fourteenth Amendment to the United States Constitution. (*Verducci*, *supra*, 243 Cal.App.4th at pp. 965-967.) Recognizing that barring retrial " 'is an unusual and extraordinary measure that properly should be invoked only with great caution' " (*id.* at p. 966), the *Verducci* court concluded the remedy was likely permissible for defendants who had numerous prior trials ending in deadlocked juries (*id.* at p. 967). Indeed, it was the defendant's reliance on the Fourteenth Amendment and the fact he experienced three deadlocked juries that made his case potentially deserving of the extraordinary remedy of dismissal and distinguished it from cases finding retrial after a hung jury permissible as a matter of course. (*Verducci*, at pp. 966-967, citing *Richardson v. United States* (1984) 468 U.S. 317, 322-324 [retrial after a hung jury does not violate double jeopardy].)

Thus, instead of concluding the remedy prohibited, the *Verducci* court reviewed the trial court's reasons for declining to bar retrial in the defendant's case. (*Verducci*, *supra*, 243 Cal.App.4th at p. 967.) It applied the settled balancing test for dismissal under California law, stating, " 'A determination whether to dismiss in the interests of justice . . . involves a balancing of many factors, including the weighing of the evidence indicative of guilt or innocence, the nature of the crime involved, the fact that the defendant has or has not been incarcerated in prison awaiting trial and the length of such incarceration, the possible harassment and burdens imposed upon the defendant by a

8

retrial, and the likelihood, if any, that additional evidence will be presented upon a retrial. When the balance falls clearly in favor of the defendant, a trial court not only may but should exercise the powers granted to [it] by the Legislature and grant a dismissal in the interests of justice.' [Citations.] We review a trial court's refusal to dismiss for abuse of discretion." (*Id*. at pp. 962-963.)

In the end, the *Verducci* court concluded it was not an abuse of discretion for the trial court to decline to dismiss the defendant's case, despite the three deadlocked juries, because the trial court reasonably found the testimony of previously unavailable witnesses added to the evidentiary showing such that the prosecution was not merely adapting to the defendant's defense with each trial. (*Verducci*, *supra*, 243 Cal.App.4th at pp. 962-963, 967.)

Here, similar to *Verducci*, we discern no abuse of discretion. As the trial court noted, the prosecution is generally permitted to a retrial after a single hung jury or after a dismissal under section 1385. (§ 1387; *Richardson v. United States*, *supra*, 468 U.S. at pp. 322-324.) This was not defendant's fourth trial; it was his second. Thus, the burdens on defendant to defend himself at trial do not clearly weigh in his favor. (See *Verducci*, *supra*, 243 Cal.App.4th at p. 967.) And while defendant argues Thornton's testimony at his first trial was fatally flawed, he does not contend it was insufficient to sustain a conviction. It is true the prosecution's evidentiary showing was not anticipated to change at retrial as defendant argues, but neither was the prosecution's strategy for conviction. This was not a case where the prosecution's strategy adapted in response to defendant's defense as presented in the first trial. (See *id*. at pp. 962, 967.) Further, defendant was charged with premeditated murder during a robbery—society has a strong interest in resolving these charges and seeking justice for the victim. (*Id*. at pp. 964, 967.) The fact the jury voted 11 to one in favor of acquittal at defendant's first trial is not of such significant weight that it counters these considerations. Accordingly, the trial court did

9

not abuse its discretion by declining to dismiss defendant's second trial on the basis the retrial would have violated due process.

## II

### *Sufficient Evidence Corroborated Thornton's Testimony*

Defendant contends there was insufficient evidence to corroborate Thornton's testimony as required of an accomplice. We disagree.

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

"An accomplice's testimony must be corroborated by independent evidence which, without aid or assistance from the accomplice's testimony, tends to connect the defendant with the crime charged. [Citations.] To determine if sufficient corroboration exists, we must eliminate the accomplice's testimony from the case, and examine the evidence of other witnesses to determine if there is any inculpatory evidence tending to connect the defendant with the offense. [Citations.] '[Corroboration] is not sufficient if it requires interpretation and direction to be furnished by the accomplice's testimony to give it value . . . .' [Citation.] It must do more than raise a conjecture or suspicion of guilt, however grave. [Citations.] On the other hand, unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543, italics omitted.) "Although corroborating evidence need only be slight and may be entitled to little consideration when standing

10

alone [citations], it is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.] Likewise, it is insufficient to show mere suspicious circumstances." (*Ibid*.)

We do, however, consider the entire conduct of the defendant and the accomplice-witnesses, their relationships with each other, and their acts during and after the commission of the crime. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32-33; *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1304-1305.) As this court has held, "proof of association in such close proximity in both time and place as to connect [the defendant] with participation" in the crime can be sufficient corroboration. (*People v. Davis* (1962) 210 Cal.App.2d 721, 729.) The evidence "need not independently establish the identity of the victim's assailant" (*People v. Abilez* (2007) 41 Cal.4th 472, 506), nor corroborate every fact to which the accomplice testifies (*Davis*, at p. 730), it need only corroborate a portion of the accomplice's testimony in such a way as to satisfy the jury that the accomplice is telling the truth (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1022; *People v. Sanchez* (1965) 232 Cal.App.2d 812, 816).

Here, the evidence outside Thornton's testimony included surveillance footage of the crime and physical evidence from the convenience store showing the shooter was dressed in black pants with a white stripe down the leg and possessed a .40-caliber handgun loaded with an extended magazine. The evidence demonstrated defendant owned pants like those worn by the shooter and likely possessed a .40-caliber handgun with a high capacity magazine at the time the murder was committed. The evidence further showed defendant knew Carter-Rae and Thornton, and was in Thornton's car at the fast-food restaurant an hour after the murder. This evidence served to associate defendant with the people involved in the robbery of Parmar around the time of the robbery. It further showed defendant was the actual shooter by putting him in possession of a gun consistent with the murder weapon and clothes worn by the actual shooter.

11

In addition to the independent evidence associating defendant with his accomplices and connecting him to the crime, the independent evidence corroborated Thornton's testimony regarding his movements, as well as Carter-Rae's and Simmons's movements, before, during, and after the murder. The car tracking data confirmed Thornton's testimony he left Stockton with Carter-Rae and Simmons, traveled to Woodbridge with them, and then to Lodi, before traveling back to Stockton with a detour to a field to dispose of evidence of their crime. The car tracking data also confirmed Thornton dropped Simmons off at his home before parking in a nearby neighborhood and then going to a fast-food restaurant where defendant was recorded with Thornton. Taken together, not only did the independent evidence corroborate Thornton's testimony as to the events of the night, but also defendant's presence and participation in the murder.

Defendant disagrees, arguing the evidence did not corroborate Thornton's testimony, as argued by the prosecution, that Thornton picked up defendant at his home before driving to Woodbridge. While the prosecution made this argument during closing argument, this was not testimony advanced by Thornton. Thornton testified he drove with Carter-Rae, Simmons, and defendant from Stockton to Woodbridge and then Lodi, where the robbery and murder occurred. He did not testify to the order in which he picked up his accomplices or where each accomplice got into his car. Further, while the car tracking data did not show Thornton's car travel into the mobile home park where defendant lived, the data did not account for every second of the car's movement and was not inconsistent with Thornton pulling over within a mile of defendant's home to pick him up like the prosecution's argument suggested. Thus, Thornton's testimony was not disproven by the independent evidence.

Defendant spends much time in his reply brief arguing he was the most likely scapegoat for Thornton to blame for the robbery and murder instead of Thornton taking the responsibility for the crimes himself. Defendant argues the car tracking data shows that after Thornton dropped off Simmons, Thornton parked for 35 minutes on a street

defendant was known to frequent.  This parking, the argument continues, establishes a time after the murder when defendant joined Thornton and accompanied him to the fast-food restaurant.  According to defendant, there is no independent evidence demonstrating he was with Thornton during the murder instead of after.  Not so.  The evidence suggested defendant possessed a gun consistent with the murder weapon, as well as pants worn by the shooter.  Further, surveillance footage was collected from Parmar's convenience store and the convenience store Thornton and the group planned to rob first, as well as from the fast-food restaurant.  Multiple images of defendant taken around the time of the robbery and murder were also submitted to the jury.  The jury was able to compare the surveillance footage, images of defendant and Thornton taken around the time of the murder, and defendant's and Thornton's appearances at trial to determine who was captured in the surveillance footage of the murder as the actual shooter.  It is the appellant's burden to show error on appeal (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549), and defendant, who is the appellant here, did not provide us with a complete record of photo and video evidence underlying the jury's determination that he was present and participated in the activities at issue.  We presume the record supported that factual determination and we do not disagree with the jury's factual findings in that regard absent reason to do so.  Thus, sufficient evidence corroborates Thornton's testimony.

### III

*The Trial Court Did Not Abuse Its Discretion By*

*Admitting Evidence Related To Defendant's Gun Possession*

Defendant contends the trial court abused its discretion by admitting gun-related evidence that was unrelated to the firearm believed to have been used in the murder, including:  (1) his unsuccessful attempt to buy guns on Instagram, (2) the discussion with Carter-Rae that Thornton wanted his gun back, (3) the request from defendant that Carter-Rae send him a picture of a shotgun, (4) the discovery of a magazine for

13

10-millimeter ammunition at defendant's house, and (5) the empty gun box. The People contend defendant forfeited these claims by failing to make a timely and specific objection. Defendant counters the prosecution agreed not to introduce, and the court agreed not to admit, evidence of unrelated guns; and, even if the claims are forfeited, defense counsel's failure to object amounted to ineffective assistance of counsel. We conclude there was no error.

Evidentiary rulings are reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196-197.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action. (Evid. Code, § 210.) Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that [the defendant] committed the crime, but only that [the defendant] is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056-1057 [the trial court erred by admitting evidence of the defendant's prior possession of a handgun similar to the murder weapon where the prosecutor did not claim such weapon was actually used in the murder]; see also *People v. Riser* (1956) 47 Cal.2d 566, 576-577 [the trial court erred by admitting evidence of a Colt .38-caliber revolver found in the defendant's possession almost two weeks after the murders where evidence showed the weapon actually used was a Smith & Wesson .38-caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649.) In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that [the] defendant is the kind of person who surrounds himself[, herself, or themselves] with deadly weapons—a fact of no relevant consequence to determination of the guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360, italics omitted.)

14

However, evidence of weapons not actually used in the commission of a crime may be admissible when it is relevant for other purposes. (*People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) The critical inquiry is whether the evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence. (*People v. Barnwell*, *supra*, 41 Cal.4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

It was not error for the trial court to admit evidence of defendant's unsuccessful attempt to buy a .40-caliber handgun on Instagram. While defendant referenced several types of guns in the unsuccessful Instagram purchasing conversation, part of his obvious intent was to obtain a .40-caliber handgun. While the conversation may not have led to the purchase of a .40-caliber handgun, it demonstrates defendant's intent and efforts to arm himself with a gun like the one used in the murder. This is relevant to whether defendant ultimately possessed a gun consistent with the one used in the murder. References to other types of guns were intricately wound into the conversation regarding the .40-caliber handgun and could not easily be sanitized. The reference to other guns, however, provided the defense with an argument defendant was not in possession of any gun, least of all a .40-caliber handgun. This argument accounts for defense's counsel's implied strategic decision not to object to the admission of the other guns mentioned in the conversation. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 [appellate courts may not reverse on ineffective assistance of counsel grounds unless the record affirmatively demonstrates defense counsel had no rational tactical purpose for the omission].)

The conversation with Carter-Rae three days after the murder wherein Carter-Rae told defendant that Thornton wanted his gun back was also admissible because Thornton testified he owned a .40-caliber handgun, which was the type of gun used in the murder. The fact Thornton's desire for the return of his .40-caliber handgun was communicated to defendant through Carter-Rae demonstrates defendant's association with Carter-Rae and

15

Thornton and defendant's possession of a .40-caliber handgun around the time of the murder. There was no abuse of discretion in the admission of this evidence, nor ineffective representation in the failure to object to it. (*People v. Lucero* (2000) 23 Cal.4th 692, 732 [counsel is not ineffective for failing to raise meritless objections].)

The conversation between Carter-Rae and defendant wherein defendant asked Carter-Rae to send him a picture of a shotgun was relevant to show the association between Carter-Rae and defendant. This association was also demonstrated by Carter-Rae and defendant's conversations pertaining to Thornton's handgun and the filming of defendant's music video. Given the limited number of conversations between defendant and the men in the group, consisting of only these conversations with Carter-Rae, defendant's request for a picture of a shotgun from Carter-Rae held probative value of their association. If defendant wanted the conversation sanitized or excluded on undue prejudice grounds, he was required to object. (Evid. Code, § 353, subd. (a) [a defendant must make a timely objection to the evidence, making "clear the specific ground of the objection"].) Defense counsel's failure to object was not ineffective given the fleeting reference to the contents of defendant's communication with Carter-Rae and the limited prejudice resulting from the contents of the message. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 [to prevail on ineffective assistance of counsel grounds, the defendant must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different"].)

Neither was it ineffective for defense counsel to fail to object to the admission of testimony that a magazine for 10-millimeter ammunition was discovered in defendant's home. The reference to the ammunition was fleeting and given as part of a list of items discovered in a closet. The focus of the testimony was the discovery of the empty .40-caliber gun box, which defendant argued did not belong to him just like the other items found in the closet. The prosecution properly limited its argument to defendant's possession of a gun consistent with the one used during the crimes charged, i.e., a

16

.40-caliber handgun, making fleeting reference to the magazine was not reasonably likely to prejudice the jury against defendant. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

As for the empty gun box, it was admissible because it belonged to a .40-caliber handgun, which demonstrates defendant may have had possession of a gun consistent with the murder weapon. Defendant contends the evidence should have been excluded because evidence in the prior trial revealed the gun belonging to the box was still in the possession of its registered owner. Not so. In the first trial the evidence demonstrated the gun was registered to a person who had lived in another part of California and had never reported the gun stolen. The testimony did not show that the gun was still in the possession of the registered owner. Thus, the gun box evidence was relevant.

Nor was it ineffective for defense counsel to not elicit more information about the gun box because defendant fails to show counsel lacked a tactical reason. (*People v. Arredondo*, *supra*, 8 Cal.5th at p. 711.) At defendant's first trial, an officer testified the gun had ties to Reedley, California and was never reported stolen while the registered owner possessed it. This testimony implies the registered owner gave the gun away or otherwise transferred it. It is reasonable defense counsel did not ask the officer at defendant's second trial about the gun's location because counsel knew the answer would not benefit his client or demonstrate the current location of the gun.

Accordingly, defendant cannot demonstrate error in the trial court's evidentiary rulings pertaining to the challenged gun evidence.

IV

*The Trial Court Did Not Err By Finding No Prosecutorial Witness Intimidation*

Defendant contends the prosecutor committed prejudicial error[2] by intimidating Thornton before his testimony. We disagree.

---

[2]      Our Supreme Court has explained "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a

17

## A

*Background*

After Thornton testified, defense counsel brought to the trial court's attention a conversation between Thornton and the prosecutor that occurred right before Thornton's testimony. According to defense counsel, Thornton asked the prosecutor whether she could take his plea deal away if anything went wrong with his testimony. In defense counsel's mind, the prosecutor's response constituted intimidation of a witness, requiring a mistrial.

The prosecutor responded to defense counsel's argument that Thornton asked her whether his plea agreement would be undone if he invoked his Fifth Amendment right under the United States Constitution not to incriminate himself. The prosecutor said she told Thornton it was possible and asked whether he would like to speak to his attorney. Thornton responded that he wanted to speak to his attorney.

The trial court denied the motion for a mistrial finding that, regardless of Thornton already being sentenced, the plea agreement was clear that if Thornton did not testify, he would not be able to benefit under the plea agreement. The trial court rejected defense counsel's argument that Thornton was under no compulsion to testify under the plea agreement because he had already been sentenced.

## B

*There Was No Prosecutorial Error*

" '[O]n claims of prosecutorial [error] our state law standards differ from those under the federal Constitution.' [Citation.] Under the federal Constitution, a prosecutor commits reversible [error] only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our

---

culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

18

state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the []conduct." ' " (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

"Even where a defendant shows prosecutorial [error] occurred, reversal is not required unless the defendant can show he[, she, or they] suffered prejudice. [Citation.] Error with respect to prosecutorial [error] is evaluated under the standards enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24, to the extent federal constitutional rights were implicated, and under *People v. Watson* (1956) 46 Cal.2d 818, 836, to the extent only state law issues were involved." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.)

Defendant relies on *In re Martin* (1987) 44 Cal.3d 1 to argue the prosecution committed prejudicial error. *Martin* addressed the circumstances when a prosecutor violates a defendant's right to compulsory process by interfering with defense witnesses. (*Id*. at pp. 28-30.) Our Supreme Court concluded the prosecution's actions of arresting one defense witness and communicating to other defense witnesses that the witnesses would be prosecuted for perjury or any crime revealed in the course of their testimony amounted to error. (*Id*. at pp. 34-40.) Specifically, the prosecution was under no legal compulsion to arrest the first witness at the time it did. (*Id*. at p. 35.) Further, the threat of prosecution against the other witnesses had the effect of intimidating the defense witnesses against testifying. (*Id*. at pp. 42, 47.) These actions taken together showed a clear violation of the defendant's right to present a defense. (*Id*. at p. 51.)

Here, Thornton was not a defense witness and defendant's right to present a defense is not implicated by the prosecutor's conduct toward Thornton. Consequently, *Martin* is distinguishable. Instead, the traditional test for prosecutorial error suffices to analyze defendant's claim.

19

Under the federal standard, the prosecutor's conduct did not result in a fundamentally unfair trial. Thornton's plea agreement required him to testify to the truth, which would be determined by the trial court and not the prosecutor or Thornton's adherence to a specific set of facts. Defendant was given the plea agreement and a transcript of Thornton's prior testimony during discovery. Thornton was further subject to cross-examination by defendant. There is also no evidence the prosecutor elicited perjured testimony or inadmissible evidence. Accordingly, there was no conduct on behalf of the prosecution that resulted in a denial of due process or a fair trial.

Under the state standard, defendant has failed to show the prosecutor acted in a deceptive or reprehensible way. At best for defendant's argument, and as he contends, the law is silent about whether Thornton was under compulsion to testify on behalf of the prosecution. At worst for defendant's argument, and as the People contend, Thornton's plea agreement required him to testify at all court hearings regarding Parmar's murder regardless of when Thornton was sentenced. When asked by Thornton about the implications of him refusing to testify and invoking his right against self-incrimination, the prosecutor referred Thornton to his attorney for guidance. There is no evidence the prosecutor deceived Thornton to gain his testimony but referred him to his own attorney who could advise Thornton of the risks of refusing to testify in light of the specific terms of his plea agreement. We discern no deceptive or reprehensible tactics here.

Defendant disagrees, arguing the prosecutor's conduct was deceptive because it gave the impression that Thornton was not under compulsion to testify, and thus distorted the factfinding process. Not so. The prosecutor made clear during direct examination that Thornton testified pursuant to a plea agreement that reduced his charges in exchange for his testimony. The prosecutor did not deceive the jury into believing Thornton willingly testified, and thus was more likely to be truthful. Consequently, there was no prosecutorial error.

20

V

*Prejudicial Error Did Not Result From*

*The Trial Court Misreading A Jury Instruction*

Defendant contends the trial court prejudicially erred by misreading a jury instruction by stating the jurors were not required to all agree on the degree of murder. We disagree that prejudicial error occurred.

A

*Background*

When reading the instructions to the jury regarding the degree of murder, the trial court said, "Defendant has been prosecuted for murder under multiple theories. Each theory of murder has different requirements. . . . You need not all agree on the same degree. But, you all must unanimously agree on the theory of murder." Defendant did not object during the reading of this jury instruction. The written instructions that accompanied the jury to deliberations correctly provided, "You need not all agree on the same theory but you must unanimously agree on the degree of murder."

B

*There Was No Prejudicial Error*

"To the extent a discrepancy exists between the written and oral versions of the jury instructions, the written instructions provided to the jury will control." (*People v. Wilson* (2008) 44 Cal.4th 758, 803; accord, *People v. Frederickson* (2020) 8 Cal.5th 963, 1026.) In *People v. Mills* (2010) 48 Cal.4th 158, 200-201, our Supreme Court found no reversible error where a trial court misread three jury instructions, including one where the court "told the jury the opposite of the correct definition," because the jury received the correct instructions in written form. Our Supreme Court concluded that "[t]he risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke." (*Ibid*.) " 'We of course presume "that jurors understand and follow the court's instructions."

21

[Citation.]  This presumption includes the written instructions.  [Citation.]  To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' " (*Id*. at pp. 200-201.)

Here, as defendant acknowledges, the written instructions were correct.  Further, the verdict form demonstrates the jury agreed on the degree of murder, finding first degree true and second degree not true.  Accordingly, there was no prejudicial error.

## VI

### *The Verdict Form Irregularities Do Not*
### *Require Reversing Or Modifying The Judgment*

Defendant contends the verdict form for his murder and associated allegations contains several errors requiring modification of the judgment.  First, he argues the jury foreperson failed to sign the jury's true finding regarding the robbery-murder special circumstance, requiring us to strike the special circumstance.  Second, he argues the verdict form misstated the firearm allegation as a personal use allegation instead of a personal discharge allegation, requiring us to strike the greater firearm enhancement under section 12022.53, subdivision (d) and impose the lesser firearm enhancement under section 12022.53, subdivision (c).  We disagree as to both contentions.

### A

### *Background*

The verdict form for the murder and attached allegations appeared as several paragraphs over two pages.  The first page included the verdict for murder and the degree.  The first paragraph asked the jury whether it found defendant guilty of murder, then provided a space for the jury foreperson's signature.  The next paragraph asked whether the jury found defendant had committed first degree murder, and similarly provided space for a signature.  The third paragraph inquired about second degree murder and also provided space for a signature.  The second page of the verdict form contained two paragraphs pertaining to the special circumstance allegation and the firearm

22

enhancement. Instead of providing a space for the foreperson's signature after each finding, the form provided a single space at the end of the form for the foreperson's signature. All other verdict forms provided for a separate signature for each finding or verdict rendered by the jury.

The language of the firearm allegation contained in the murder verdict form provided, "We, the jury in the above entitled cause, further find that in the course of the [m]urder, the defendant . . . personally and intentionally *used* a firearm in the commission of the [m]urder, pursuant to . . . [s]ection[,] 12022.53[, subdivision (d)], causing the death of [the victim]." (Italics added.)

B

*Reversing Or Modifying The Judgment Is Not Required*

"[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (*People v. Webster* (1991) 54 Cal.3d 411, 447; accord, *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272-1273.)

As to the special circumstance finding, the jury clearly intended to find it true. While there was no signature directly below the finding, there was a signature at the bottom of the document that was also dated. Further, the jury circled the word true, indicating it discussed and decided the issue in the affirmative.

As to the firearm enhancement, it is clear the jury intended to convict defendant of a personal discharge causing death enhancement under section 12022.53, subdivision (d). While the verdict form provides the enhancement is a personal use enhancement, the form also provides that the use of the firearm caused the death of the victim. The victim here was killed by the discharge of a firearm, not through any other use of it. Further, the jury was instructed only on a personal discharge enhancement, and the prosecution argued only for a finding that defendant was the actual shooter. Thus, when completing the verdict form for the firearm enhancement, the jury necessarily determined defendant

23

personally and intentionally discharged a firearm causing the victim's death under section 12022.53, subdivision (d).

Consequently, the irregularities in the verdict forms do not require reversing or modifying the judgment.

VII

*Sentencing Claims*

A

*Given Defendant's Life Without Parole Sentence For Murder,*

*The Term Of Years Imposed For That Conviction Must Be Stricken*

Defendant contends the trial court erred by imposing a term of years for his murder conviction because he was sentenced to life without parole pursuant to the special circumstance finding attached to that count. The People agree, as do we—life without parole sentences do not contain minimum terms. (*People v. Mason* (2024) 105 Cal.App.5th 411, 416; *People v. Smithson* (2000) 79 Cal.App.4th 480, 503.) Accordingly, the minimum term attached to defendant's life without parole sentence is stricken.

B

*The Sentence For The Robbery Conviction*

*Must Be Stayed Pursuant To Section 654*

Defendant argues his sentence for robbery must by stayed pursuant to section 654 because his sentence of life without parole is based on the robbery special circumstance, which was based on the same conduct underlying the robbery conviction. The People disagree, arguing defendant's robbery sentence is proper given the egregiousness of his conduct. We agree with defendant.

Section 654, subdivision (a) provides in relevant part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than

one provision." "[S]ection 654 bars multiple punishment[s] for the same aspect of a criminal act," which includes aspects punished by conduct enhancements. (*People v. Ahmed* (2011) 53 Cal.4th 156, 162-164, italics omitted.) Fundamentally, section 654 prohibits multiple punishments for an indivisible course of conduct—that is where the defendant committed more than one offense incident to a single criminal objective. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) The defendant's intent and objective determine whether the course of conduct is indivisible. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid*.) The determination of a defendant's intent and objective are factual matters for the trial court to determine. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.) "We must affirm if substantial evidence supports a trial court's express or implied determination that punishment for crimes occurring during a course of conduct does not involve dual use of facts prohibited by section 654." (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1297.)

Here, defendant was convicted of first degree murder. His sentence was enhanced to life without parole pursuant to a felony-murder special-circumstance finding under section 190.2, subdivision (17), which was based on defendant committing murder during the course of a robbery. Because defendant's robbery served to enhance defendant's murder sentence, it cannot also serve as the basis to impose punishment on the robbery conviction.

The People disagree, relying on *People v. Nguyen* (1988) 204 Cal.App.3d 181, 190-191, to argue defendant's robbery and murder of the victim was especially egregious and deserving of separate punishment. In *Nguyen*, the trial court sentenced the defendant consecutively to attempted murder and robbery. (*Id*. at p. 189.) The appellate court concluded this was not error because the attempted murder occurred after the robbery and was not necessary to facilitate the robbery, thus presenting a divisible and nonincidental

25

act. (*Id*. at pp. 189-190.) Even assuming the robbery here was a divisible act from the murder, defendant was punished for it by application of the special circumstance enhancement and life without parole sentence, a fact missing in *Nguyen*. (*Id*. at p. 189.) Accordingly, defendant's sentence for robbery must be stayed pursuant to section 654.

C

*Defendant's Life Without Parole Sentence Does Not Violate Equal Protection*

In supplemental briefing, defendant contends his life without parole sentence violates equal protection principles, citing *People v. Briscoe* (2024) 105 Cal.App.5th 479 (*Briscoe*). The defendant in that case was convicted of first degree murder, robbery, and burglary with a true finding on a special circumstance allegation under section 190.2, subdivision (d), and was sentenced to life without parole. (*Briscoe*, at p. 485.) The defendant was 21 years old when he committed his crimes and was therefore ineligible for a section 3051 youth offender parole hearing based on his age and sentence. (*Briscoe*, at pp. 485-486.)

On appeal, the defendant claimed that "section 3051 violates equal protection by excluding youth offenders sentenced for special circumstance murder under section 190.2, subdivision (d)—which applies to *nonkiller participants* in specified felony offenses during which a murder occurred—while including those convicted of nonspecial circumstance first degree felony murder for the same specified felony offenses per the exact same standard under section 189, subdivision (e)(3)." (*Briscoe*, *supra*, 105 Cal.App.5th at p. 485, italics added.) The *Briscoe* court noted that the Legislature "amended section 189 to limit felony-murder liability[,] in part by directly incorporating the section 190.2, subdivision (d) standard into the definition of first degree felony murder under section 189, subdivision (e)(3)." (*Briscoe*, at p. 491.)

The *Briscoe* court then observed that *People v. Hardin* (2024) 15 Cal.5th 834 held the culpability associated with life without parole offenses provides a rational basis to exclude youth offenders sentenced to life without parole from section 3051 relief.

26

(*Briscoe*, *supra*, 105 Cal.App.5th at p. 492.)  However, "this logic falls apart when applied to the particular special circumstance and the facts at issue [t]here. Section 190.2, subdivision (d) describes the exact same circumstances and conduct that is now necessary to support a conviction for first degree felony murder under section 189, subdivision (e)(3).  The disparate treatment of offenders who committed murder per these identical provisions during the same underlying felonies cannot reflect any difference in culpability." (*Briscoe*, at p. 492.)  The *Briscoe* court therefore found that no rational reason existed "for section 3051 to exclude section 190.2, subdivision (d) offenders from a parole opportunity provided to section 189, subdivision (e)(3) offenders convicted under the exact same standard." (*Briscoe*, at p. 495.)

*Briscoe* is distinguishable.  That case concerned a special circumstance allegation under section 190.2, subdivision (d), which is applicable to nonkiller participants. (*Briscoe*, *supra*, 105 Cal.App.5th at p. 485.)  In contrast, defendant's jury found true a special circumstance allegation under section 190.2, subdivision (a)(17). Subdivision (a)(17) provides for a penalty of life without parole if the murder "was committed *while the defendant was engaged in*, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" specified felonies, including robbery.  (Italics added.)  Thus, while section 190.2, subdivision (d) expressly applies to only nonkillers, that is not necessarily so with section 190.2, subdivision (a)(17).  Subdivision (a)(17) may also apply to actual killers, who commit murder while intending to commit a felony such as robbery.  (See generally CALCRIM No. 730.)  As discussed, it is clear the jury here found defendant was the actual killer, contrary to defendant's argument.

Alternatively, defendant argues, "A youthful actual killer convicted of first degree felony murder for the commission of murder during the perpetration of robbery pursuant to [section] 189, subd[ivision] (a), without a special circumstance finding, is not excluded from youth offender parole eligibility.  Yet, a youthful actual killer convicted of first

27

degree felony murder for the same crime, with a section 190.2, subd[ivision] (a)(17), circumstance found true, is not parole eligible, even though the first-degree felony murder conviction for his or her hypothetical twin is the same finding that supports his or her special circumstance finding." (Italics omitted.) We do not need to address this argument because the verdict form for defendant's first degree murder finding shows the jury selected premeditation and deliberation as the theory underlying the conviction—not felony murder, which was the basis of the special circumstance finding. This theory was relied on by the prosecution during closing argument and announced as the jury's verdict during oral pronouncement of the verdicts. Thus, unlike defendant's hypothetical argument, his conviction is not based on the same findings as a conviction eligible for youth offender parole. Accordingly, defendant's life without parole sentence does not violate equal protection principles.

## DISPOSITION

The judgment is modified to strike the minimum term of years imposed for defendant's murder conviction, keeping the life without parole sentence intact, and to stay the six-year term imposed for defendant's robbery conviction in count 2 under section 654. The judgment is affirmed as modified. The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

/s/
ROBIE, Acting P. J.

We concur:

/s/
DUARTE, J.

/s/
RENNER, J.

29